Rosario Joseph DISPENSA,
Petitioner-Appellee,

v.

James A. LYNAUGH, Director, Texas
Department of Corrections,
Respondent-Appellant.

No. 86–2894.

United States Court of Appeals,
Fifth Circuit.

Sept. 4, 1987.

Jim Mattox, Atty. Gen., Charles Rex Hall, Jr., Asst. Atty. Gen., Austin, Tex., for respondent-appellant.

Alder & O'Conor, Robert O'Conor, Jr. (Court appointed), Houston, Tex., for petitioner-appellee.

Before RUBIN, GARZA and JOLLY, Circuit Judges.

ALVIN B. RUBIN, Circuit Judge:

The State of Texas appeals from a district court order granting a prisoner convicted of rape a writ of habeas corpus due to the suggestiveness of the identification procedures the police used and the subsequent unreliability of the in-court identification evidence offered by the victim. Because we conclude that new evidence introduced at the federal habeas corpus hearing makes the petitioner's claims stronger than they were when presented to the state courts, we vacate the writ and remand for exhaustion of state remedies.

I.

In 1982 Rosario Joseph Dispensa was convicted of entering Theresa Ellen Barthel's apartment at 4:00 a.m. and raping her. He was sentenced to fifteen years imprisonment for the offense. The primary evidence linking Dispensa to the scene of the crime was Barthel's identification testimony, which Dispensa alleges is unreliable and was influenced by impermissibly suggestive police identification procedures. Because the state court decisions offered no specific findings of fact about how the police originally presented Dispensa to Barthel for identification, the district court decided that it was free to make its own determination about what happened. It considered the testimony Dispensa offered at a federal habeas corpus hearing and the record of the testimony of state witnesses at Dispensa's suppression hearing and trial, and concluded that the police identification procedure used was impermissibly suggestive and that the identification offered by Barthel was not otherwise reliable. Although the details of the police identification procedure Dispensa described at his habeas hearing differed markedly from his description of them when he testified in state court and were supplemented for the first time by expert psychological analysis suggesting that Barthel's state-court testimony demonstrated that she relied on the police to make the identification for her, the district court concluded that the new evidence did not significantly change the strength of Dispensa's case. Therefore, it concluded that exhaustion of the new evidence in state court was unnecessary and granted Dispensa the relief he requested: His conviction was overturned and the state ordered either to retry him without using Barthel's identification testimony or to release him from custody.

II.

■ A habeas corpus petitioner must exhaust all available state remedies before his claims may be considered by a federal court.[1] The considerations of comity underlying the exhaustion doctrine require that the state courts be given the initial opportunity to address and, if necessary, correct alleged deprivations of federal con-

---

1. *See* 28 U.S.C. § 2254(b), (c) (1982); *Picard v. Connor,* 404 U.S. 270, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971).

stitutional rights.[2] In assessing whether a petitioner's claims have been properly exhausted, therefore, the proper inquiry is whether the state courts have been given a fair opportunity to review them.[3] Although it is not necessary that a petitioner pronounce every syllable of his claim before the state courts, he must present to them the substantial equivalent of the claim he later asserts in federal court.[4] Thus when "a federal habeas petitioner presents newly discovered evidence not before the state courts such as to place the case in a significantly different and stronger evidentiary posture than it was when the state courts considered it, the state courts must be given an opportunity to consider the evidence."[5]

■ To determine whether the new evidence Dispensa introduced at his federal hearing placed his case in a significantly stronger posture, it is necessary to examine both what Dispensa was required to prove to gain relief and the extent to which the evidence before the state courts and the evidence adduced at Dispensa's federal hearing fulfilled that burden. This circuit has adopted a two-part test for determining whether identification testimony is sufficiently tainted by suggestive police identification procedures to require its suppression.[6] The first inquiry is whether the procedures used to make the initial identification were impermissibly suggestive. The second is whether the identification is nonetheless reliable. The ultimate reliability of an identification is evaluated by the "totality of the circumstances" as established through analysis of five factors: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation;

and (5) the length of time between the crime and the confrontation.[7]

Although we agree with the district court that the state record contains evidence casting doubt on the propriety of the identification procedures used, on the reliability of the identification Barthel offered, and—ultimately—on the validity of the conviction itself, the inconsistencies in the testimony of the State's witnesses do not preclude credibility choices reasonably supporting a determination that the identification is admissible. The new factual allegations Dispensa has made and the expert testimony he offered fill in important evidentiary gaps in Dispensa's theory of the case. If credited, the new evidence transforms Dispensa's assertion that the procedure used was impermissibly suggestive from a borderline case to a clearly egregious one and substantially enhances the evidentiary basis for concluding that the identification is otherwise unreliable.

### A.

When Dispensa became a suspect in Barthel's rape, Houston Police detectives L.H. Henning and Ralph Yarborough decided to take Barthel to the restaurant that Dispensa managed to see if she would recognize him as her assailant. Rather than escorting her directly to the restaurant, however, the detectives first walked with her through the mall in which the restaurant was located and asked her to observe the crowd and let them know if she recognized anyone. Twenty or thirty minutes later, they took her to eat lunch at the restaurant where Dispensa worked. After he had finished eating, Yarborough excused himself from the table and asked the cashier if he could speak to Dispensa. Eventually, he was escorted to Dispensa's office at the rear of the restaurant. Yarborough there

**2.** *Anderson v. Harless,* 459 U.S. 4, 103 S.Ct. 276, 74 L.Ed.2d 3 (1982).

**3.** *Id.* at 16, 103 S.Ct. at 277.

**4.** *Spiegel v. Sandstrom,* 637 F.2d 405, 407 (5th Cir. Unit B 1981); *Lamberti v. Wainwright,* 513 F.2d 277, 282 (5th Cir.1975).

**5.** *Brown v. Estelle,* 701 F.2d 494, 495 (5th Cir. 1983).

**6.** *See, e.g., McGee v. Estelle,* 632 F.2d 476, 477 (5th Cir.1980).

**7.** *See Neil v. Biggers,* 409 U.S. 188, 199, 93 S.Ct. 375, 382, 34 L.Ed.2d 401 (1972).

informed Dispensa that he was a suspect in a sex crime and told him that he could either walk through the restaurant so that the victim could see him or be subject to arrest and a police line-up. Dispensa chose to walk through the restaurant.

None of the witnesses to the identification procedure agreed precisely on how it was conducted. Detective Yarborough testified that, on Dispensa's first pass through the restaurant, he walked hastily through the tables and returned to his office, where Yarborough was waiting. Yarborough then asked Dispensa to wait while he checked with Henning to see if Barthel had reacted as Dispensa walked by. In a whispered conversation at the table, Henning told him that nothing had occurred. Consequently, Yarborough returned to Dispensa's office and asked him to walk through the restaurant again. This time, however, Yarborough stated that he preceeded Dispensa from the office and waited for him at the cashier's desk. He said Dispensa then walked through the restaurant a second time, taking a different path that placed him directly in front of Barthel, and finally he walked up to Yarborough. As Dispensa approached, he asked Yarborough if the second pass was good enough. Yarborough asserts that he then looked over Dispensa's shoulder to see if there had been any reaction and saw Henning struggling to keep Barthel seated.

Detective Henning testified at trial that he did not know what Dispensa looked like when he and Yarborough took Barthel to the restaurant and that he did not signal to her to look at Dispensa as he approached their table. Instead, he contended, he merely told her to be generally observant of the people in the restaurant. He testified at the suppression hearing that, while Yarborough was away from the table, Barthel told him that a man had just passed by who looked like the rapist but that Henning himself had only gotten a glimpse of the man to whom she referred. He stated that he next saw Dispensa when Dispensa was approaching the cashier's desk. Although he admitted that Yarborough was also in that general area, he denied seeing the two men walk to the register together and

could not remember how close together they were standing when Barthel turned around on her own volition, saw Dispensa clearly, exclaimed that he was the rapist, and burst into tears.

Barthel's testimony contradicted elements of both Yarborough's and Henning's accounts. She asserted that she never saw Yarborough return to the table after he excused himself. More importantly, she repeatedly stated at the suppression hearing that Henning told her when to look at Dispensa, and she became so angry when Dispensa's attorney strove to confirm her testimony that she needed to ask for a recess to regain her composure. Nonetheless, she consistently stated that Henning effectively pointed Dispensa out to her as he walked past. She stated that the first time Henning told her to look, Dispensa walked past before she could see his face. She stated that, when however, Henning told her to look a second time, she saw Dispensa well for the first time and recognized him immediately. She also asserted that she did not see Yarborough with Dispensa in the restaurant and that she fled the dining room area after making the identification.

At the suppression hearing and the trial, Dispensa described two passes through the restaurant as well. He stated that on the first pass he walked by every table, checking the settings, and then returned to his office, where Yarborough was waiting. Yarborough then checked with his partner and, upon returning, told Dispensa that someone had not gotten a good look at him. He therefore asked Dispensa to walk through again, and Dispensa reluctantly complied. Dispensa testified, however, that on the second pass Yarborough followed behind him and and that—rather than meandering through the tables as he had done on the first pass—he proceeded directly to the receptionist's desk at the front of the restaurant. There, he said, he and Yarborough talked one or two minutes before Yarborough escorted him back to his office. Dispensa said that Yarborough then left the office again to check with Henning and returned with a uniformed

policeman to make the arrest. He stated further that he did not notice any commotion while he was in the restaurant indicating that an identification had been made.

Dispensa's federal hearing testimony differed markedly from his prior account of the identification procedure. Instead of describing a single full pass through the restaurant and a second, abbreviated trip to the receptionist's desk and back, he asserted that he was asked to make two full passes through the restaurant before he and Yarborough walked together from his office to the receptionist's desk and talked two or three minutes. Between each of these passes, he testified, Yarborough left him in the office and checked with Henning to see if an identification had been made. He explained that he failed to mention the second full trip through the restaurant to the trial court because his trial counsel told him that the court would be less likely to believe his account if he testified to more passes than Yarborough and Henning admitted. At his federal hearing, Dispensa also testified for the first time that, during his first pass through the restaurant, he greeted the people at each occupied table as he checked their table settings. Because he did not know where Barthel and Henning were seated, he testified, he could not tell when the identification actually was made.

In addition to the modifications to his account of the identification procedure, Dispensa offered expert psychological testimony about the significance of Barthel's choice of words and her apparent emotional state at the suppression hearing. Dr. Fred Fason explained that Barthel's repeated assertion that Henning told her when to look and her stated anger during cross examination about that testimony suggest that she unconsciously relied on the police to identify the rapist for her and that she felt guilty and angry with herself for not being able to make the identification alone. By analyzing the transcript of her testimony, Dr. Fason also concluded that Barthel's assertions that she did not know why the police were taking her to the mall, despite the fact that there was only one obvious reason for such a trip, suggests that she

had suspended her critical thinking and therefore was especially susceptible to suggestion. In response to questions posed by Dispensa's new counsel about discrepancies between the description of her assailant that Barthel gave to the police and Dispensa's actual appearance, Dr. Fason testified that she most likely would have noticed if her attacker was especially hairy, that she would also have been likely to notice prominent tatoos, and that poor descriptions such as the one she offered the police after the attack are consistent with a determination that she had repressed her memory of the attacker and could no longer accurately recall his appearance. Finally, he offered general testimony about the poor performance of victims in witness-identification experiments and about the low correlation between witnesses expressed confidence in the identifications they have made and the accuracy of their choices.

### B.

█ If credited, as it was by the federal magistrate, the combined impact of Dispensa's new evidence is substantial. His testimony that he addressed the parties seated at each occupied table during his first pass through the restaurant is the only direct evidence casting doubt on Barthel's assertion that she recognized Dispensa the first time she saw his face. That evidence, therefore, is a significant factor in evaluating the level of certainty she demonstrated at the confrontation, one of the five factors relevant to determination of the reliability of the identification.

The new details brought out in Dispensa's federal testimony also draw into greater controversy the reasonableness of asking him to make a second pass—and possibly a third—through the restaurant after the first showing had failed to result in a positive identification. It would be one thing for Yarborough and Henning to decide to try one additional showing if they reasonably believed that Barthel simply had not seen Dispensa the first time he walked by her and quite another if they chose to try twice again after she had failed to recognize Dispensa even as he

addressed her and Henning. Although Dispensa argues that the fact that he spoke to the parties at each table follows naturally from his testimony in state court that he, as the restaurant manager, checked the settings at each table during his first pass, the two activities are neither necessarily related nor equally probative of the issues central to this case. The state courts, therefore, can in no way be faulted for failing to make that assumption based on Dispensa's previous testimony.

Similarly, the testimony offered by Dr. Fason does much more than simply highlight what is already obvious from Barthel's testimony. Dr. Fason assigned to that testimony a psychological interpretation that not only suggested that he personally believed Barthel was testifying untruthfully and that Henning's behavior was suggestive but also that Barthel's mental state at the time made her especially vulnerable to suggestion and that she was, while testifying, reacting emotionally to her inability to identify the assailant independently. A layman's review of the state record would not necessarily lead him to conclude, as the district court suggests, precisely what Dr. Fason has described. Barthel's testimony could also be understood to indicate that, while Henning may have exceeded proper bounds by pointing Dispensa out to her, she recognized Dispensa on her own as soon as she saw his face. Her anger could thus be understood to be a reaction to efforts by defense counsel to undermine an identification in which she was confident by stressing, as dispositive of the case, that Henning acted improperly. Although expert analysis may ultimately prove that interpretation untenable, the bare record does not. The testimony offered by Dr. Fason, therefore, provides significant new insights to that record that otherwise may not have been apparent. At the very least, it is weighty evidence confirming suspicions about the potential import of Barthel's testimony and pointing out new portions of the transcript relevant to that inquiry.

In much the same manner, Dr. Fason's testimony regarding the kind of detail about the rapist Barthel could be expected to have noticed adds an important authoritative perspective to her failure to recall whether the rapist was, like Dispensa, particularly hairy or had prominent tatoos. It also presents a line of psychological thought contrary to the "tunnel vision" hypothesis introduced—though perhaps improperly—by the prosecution at trial in an effort to explain the lack of detail in Barthel's description of the assailant. If credited, such expert testimony would markedly influence the weight given vital factors in the calculus employed to determine identification reliability.

Because Barthel's identification testimony was crucial to the state's case against Dispensa and the description of the assailant she gave to the police describes Dispensa poorly, the suggestiveness of the identification procedure used and the certainty of Barthel's identification at the restaurant are inquiries of paramount importance. Barthel had a good opportunity to see her assailant; he remained in her well-lit room fifteen or twenty minutes. Her attention for part of that period was good, but she also testified that she covered her face with a pillow during the rape itself. The length of time between the crime and the confrontation was one week, short enough so that her actual memory was unlikely to have faded but long enough for mental reconstruction and suggestion to introduce some level of memory distortion. Under these circumstances, evidence introducing significant, new considerations to analysis of the fact or degree of suggestiveness of the identification procedure and the certainty of the identification at the time of confrontation is central to the case. Although, in isolation, the new details and lines of expert analysis offered in Dispensa's behalf may not have substantially affected the strength of his case, in total they clearly do. The state therefore must be afforded the first opportunity to weigh the credibility and effect of that evidence.

### III.

■ Dispensa contends that even if the new evidence places his case in a significantly different and stronger posture, the

exhaustion requirement in this case should be mitigated because the state courts refused either to grant him a hearing or to appoint counsel to represent him when he challenged the identification procedure and testimony in his state habeas petition. Because exhaustion is not considered to be a jurisdictional prerequisite, the federal courts have heard claims not previously considered by the state courts.[8] Exceptions to the exhaustion requirement, however, generally have been recognized only if the state has waived the requirement, there is no opportunity to obtain redress in state court, or the corrective process is so clearly deficient as to render futile any effort to obtain relief.[9] Dispensa's observation that the state deprived itself of the opportunity to hear whatever new evidence he would have presented by denying him a hearing on his state habeas application establishes none of these circumstances. There has been no express waiver of the exhaustion requirement in this case. Moreover, review of the record demonstrates that Dispensa in no way indicated that significant new evidence existed, and there is no basis to believe that the state courts would be unwilling to hear the new evidence on remand. Mitigation of the exhaustion requirement is therefore not warranted.

For the reasons stated above, the order of the district court granting Dispensa's application for a writ of habeas corpus is *vacated* and the case *remanded with directions to dismiss without prejudice.*

---

**8.** *Galtieri v. Wainwright,* 582 F.2d 348, 354 (5th Cir.1978).

**9.** *See, e.g., Duckworth v. Serrano,* 454 U.S. 1, 3, 102 S.Ct. 18, 19, 70 L.Ed.2d 1 (1981); *Hart v.*

*Estelle,* 634 F.2d 987, 989 (5th Cir. Unit A 1981); *Galtier,* 582 F.2d at 354–55. *See also* 28 U.S.C. § 2254(b).