Arthur Nathaniel AIKEN,
Plaintiff–Appellant,

v.

James SPALDING, Superintendent, Washington State Penitentiary, and Slade Gorton, Attorney General, State of Washington, Defendants–Appellees.

No. 85–4229.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Nov. 3, 1986.

Decided Jan. 21, 1988.

As Amended March 1, 1988.

Zenon P. Olbertz, McCluskey, Sells, Ryan, Olbertz & Haberly, Bremerton, Wash., for plaintiff-appellant.

Michael Madden, Asst. Atty. Gen., Olympia, Wash., for defendants-appellees.

Before SKOPIL, FLETCHER and POOLE, Circuit Judges.

PER CURIAM:

Arthur Nathaniel Aiken appeals the denial of his petition for writ of habeas corpus. He was convicted by a jury in 1965 in a Washington State court on three counts of first degree murder. Originally sentenced to death, Aiken is now serving three consecutive life terms. He argues, among other things, that the interrogating officers violated his right to counsel, and that his confessions were involuntary.

BACKGROUND

In March and April 1965, three service station attendants were robbed and murdered in the Seattle area. Antonio Wheat, appellant's co-defendant, was arrested on April 24, 1965, the day of the third homicide. His statements to police implicated Aiken, who was arrested at 4:19 p.m. the next day, in Blaine, Washington. Aiken was taken to the County–City Building, in Seattle, at approximately 12:15 a.m., the morning of April 26, 1965. En route, the officers informed Aiken that he was being held on a charge of homicide and robbery, and advised him of his rights. At approximately 12:20 a.m., Officers Chase and Mullen began to question Aiken regarding one of the homicides. Without the knowledge of the interrogating officers or Aiken, virtually all of the initial interrogation session was tape-recorded.

After Aiken denied any and all knowledge of the crimes, the officers told him (truthfully) that his co-defendant, Wheat, had given a statement blaming the murders on Aiken. Aiken was permitted to read Wheat's statement regarding one of the homicides, after which the following colloquy ensued:

AIKEN: That's a damn lie.

CHASE: You tell us the truth then if this is a lie.

AIKEN: *Well, I'd like to see an attorney* . . .

MULLEN: This matches all the physical evidence. The guy is not lying

AIKEN: He is lying.

MULLEN: We have got the physical evidence of the scene.

AIKEN: He is lying

CHASE: What is he lying about.

MULLEN: What's he lying about? Tell us what he is lying about.

AIKEN: *I'd like to see an attorney.*

CHASE: What is he lying about?

AIKEN: He is lying

MULLEN: Where? Show us where he is lying in there.

AIKEN: *I don't want to say anything.*

CHASE: Just one place.

MULLEN: One place in there that he's lyin'.

CHASE: Just one place. Just one place that he is lying.

AIKEN: *I don't care to say anything.* That's a lie.

CHASE: Tell you what's gonna happen.

MULLEN: You don't cooperate with us, you will be charged on every single count. This isn't a threat or anything like this. This is a promise. We are not shooting blanks, son. We are not mad at you. We have no axe to grind. All we are concerned about is the truth. We are just laying the facts on the table. We are showing you our hand. This is a royal flush. You can't beat it.

(Emphasis supplied.) Aiken continued to insist that the charges were "counterfeit." At 1:00 a.m., Chief Detective Nault entered the interview room and corroborated the fact that Wheat had given the statement Aiken had read. Nault offered Aiken a chance to tell his side of the story. Aiken requested the opportunity to confront Wheat. When Wheat was brought into the room he confirmed that he had made the statement. Aiken reiterated that it was a lie and said that he wanted to give his version of events.

Aiken proceeded to make and sign three statements admitting to participation in each of the three homicides, maintaining throughout that Wheat was the one who actually fired the shots. Prior to making each statement, Aiken was admonished by the interrogating officers that he had the right to remain silent, the right to an attorney and that anything he said could be used as evidence against him. In each instance, Aiken stated that he understood his rights.

Both Aiken and Wheat were convicted on three counts of first degree murder and sentenced by the court to death. The Supreme Court of the State of Washington, on direct appeal, found that the interrogation tape "may reveal at least two occasions when said defendant Aiken may have requested the assistance of counsel." The Court remanded the cause to the trial court for the purpose of conducting a supplemental hearing on the voluntariness and admissibility of Aiken's statements.

At the supplemental hearing, held in May 1967, the interrogation tape was played repeatedly on the original machine and on a new Tandberg 923–E tape recorder. Officers Mullen and Chase testified that they did not hear Aiken request the assistance of an attorney or express a wish to terminate the interrogation. The court stated that it heard "what appears to be a request by the defendant Aiken for an attorney on possibly two occasions," but that nevertheless:

[t]he officers did not ignore any request for an attorney or a desire to remain silent, for they heard no such requests and could not act upon a word or statement they did not hear.

The court concluded that Aiken had waived his right to counsel and that his statements

had been given freely and voluntarily. By a 5–4 vote, the Washington Supreme Court affirmed the judgments and sentences. *State v. Aiken,* 72 Wash.2d 306, 434 P.2d 10 (1967). Several appeals followed.[1]

On September 5, 1985, the district court denied Aiken's habeas corpus petition, which is now before us on appeal.[2]

## DISCUSSION

In his habeas petition, Aiken presents new evidence that is material to the issue of whether the interrogating officers heard and ignored Aiken's requests for counsel and for the interrogation to cease. This evidence consists of decibel-level studies by an expert, Dr. Shipp, who examined the original tape recordings using modern sound equipment.

■■■■ The "decibel-level" evidence was, of course, not available at any stage of the proceedings in state court. Aiken's presentation of new evidence at this juncture raises the question of whether he has fully exhausted his state remedies. Although the state Attorney General appears to have "conceded" that Aiken exhausted his state remedies, *see* Magistrate's Report at 9, we may examine the exhaustion question sua sponte. *Granberry v. Greer,* — U.S. ——, 107 S.Ct. 1671, 1675, 95 L.Ed.2d 119 (1987); *Batchelor v. Cupp,* 693 F.2d 859,

862–63 (9th Cir.1982) (rejecting state's position that petitioner had exhausted state remedies); *Campbell v. Crist,* 647 F.2d 956, 957 (9th Cir.1981).

In *Dispensa v. Lynaugh,* 826 F.2d 375 (5th Cir.1987), the habeas petition presented new evidence from a psychology expert regarding the possible inaccuracy of the identification procedure used to convict the defendant. The court held that this new evidence should be presented first to state court:

> [Where] a federal habeas petitioner presents newly discovered evidence or other evidence not before the state courts such as to place the case in a significantly different and stronger evidentiary posture than it was when the state courts considered it, the state courts must be given an opportunity to consider the evidence.

*Dispensa,* 826 F.2d at 377 (quoting *Brown v. Estelle,* 701 F.2d 494, 495 (5th Cir.1983)).

In the instant case, Aiken brought his federal habeas petition without having petitioned the state court for habeas relief. However, Dr. Shipp's affidavit substantially improves the evidentiary basis for Aiken's right-to-counsel and voluntariness arguments, thereby presenting the very type of evidence which the state should consider in the first instance. *See Granberry v.*

1. The judgments were vacated by the United States Supreme Court which remanded for reconsideration in light of its decisions regarding death-qualified juries and joint trials of co-defendants. *Wheat v. Washington,* 392 U.S. 652, 88 S.Ct. 2302, 20 L.Ed.2d 1357 (1968). On remand, the Supreme Court of Washington reaffirmed the convictions. *State v. Aiken,* 75 Wash.2d 421, 452 P.2d 232 (1969). The Supreme Court again reversed the judgment, insofar as it imposed the death sentence, and remanded the case for resentencing. *Aiken v. Washington,* 403 U.S. 946, 91 S.Ct. 2283, 29 L.Ed.2d 856 (1971). The Washington Supreme Court remanded to the trial court which sentenced Aiken to three consecutive life terms.

2. Aiken filed a pro se habeas petition in July 1979 in the District Court for the Eastern District of Washington. The case was transferred to the Western District where it was dismissed as untimely under Rule 9(a) of the Rules Governing Section 2254 cases, 28 U.S.C. foll. § 2254. On appeal we reversed and remanded for find-

ings on the issue whether the state had suffered prejudice within the meaning of Rule 9(a). Aiken, with the assistance of counsel, filed an amended petition which the district court dismissed on September 2, 1981. This court again vacated the dismissal and remanded. *Aiken v. Spalding,* 684 F.2d 632 (9th Cir.1982), *cert. denied,* 460 U.S. 1093, 103 S.Ct. 1795, 76 L.Ed.2d 361 (1983).

On remand, the United States Magistrate heard oral argument, and recommended that Aiken's petition be denied based on its findings that (1) there was "fair support in the record" for the conclusion by the trial court that the interrogating officers did not hear Aiken's request to consult with an attorney; (2) under the totality of the circumstances, Aiken's confessions were voluntary; (3) the trial judge did not arbitrarily deny defense counsel access to the interrogation tapes; and (4) Aiken did not establish that he was denied a fair trial or impartial jury due to pretrial publicity. The magistrate's recommendations were adopted by the district court.

*Greer*, — U.S. —, 107 S.Ct. at 1675, 95 L.Ed.2d 119; *Dispensa*, 826 F.2d at 377.[3]

## CONCLUSION

We VACATE the district court's decision and DISMISS the habeas petition, without prejudice, for failure to exhaust state remedies.

POOLE, Circuit Judge, dissenting:

I respectfully dissent. While I have no quarrel with the majority opinion's exposition of the facts, I believe that the majority misconceives the central issue involved here, which is whether the expert evidence regarding the adjacent statements recorded on the tape affects the conclusiveness which must be given to the trial court's determinations of credibility. As I do not believe that this "new" evidence undermines the credibility findings of the state court or fundamentally alters the nature of Aiken's claim, which was fully and fairly litigated before the state court, I would affirm the denial of the writ.

I believe that the issue of exhaustion is disposed of by the Supreme Court's opinion in *Vasquez v. Hillery*, 474 U.S. 254, 106 S.Ct. 617, 88 L.Ed.2d 598 (1986). In *Vasquez*, the respondent had presented his equal protection challenge to the selection of the grand jury at every level in the state courts. 474 U.S. at 256, 106 S.Ct. at 620. In response to a request from the district court, the respondent submitted three items of evidence which formed the basis for the state's nonexhaustion claim: census data from the year 1900, three affidavits from residents of the County, and a statis-

tical analysis of the cumulative census data from 1900 to 1960.[1] 474 U.S. at 258–59, 106 S.Ct. at 620–21; *see also Hillery v. Pulley*, 533 F.Supp. 1189, 1199 (E.D.Cal. 1982).

The district court in *Hillery* carefully addressed this issue and applied a standard similar to that applied here:

> The test for "fair" presentation is whether the new material presents the petitioner's action in "a significantly different posture" from that considered by the state courts.

533 F.Supp. at 1200. The court found that the census evidence and the affidavits were merely cumulative evidence relating to facts which were not in dispute. Regarding the statistical analysis, he said:

> The testimony proffered by petitioner is simply an expert analysis of evidence already before the court and is not, in this sense, "new evidence." In this regard it seems relatively clear that the statistical analysis of census data is the kind of information designed ... to aid the trier of fact in understanding the evidence before the court.

*Id.* at 1202.

On final hearing, the district court granted the writ. *Hillery v. Pulley*, 563 F.Supp. 1228 (E.D.Cal.1983). In affirming, both this court and the Supreme Court expressly approved the district court's opinions. *See Vasquez v. Hillery*, 474 U.S. at 256 n. 1, 106 S.Ct. at 619 n. 1 ("thorough and well-reasoned"), *aff'g Hillery v. Pulley*, 733 F.2d 644 (9th Cir.1984) ("excellent and extensive"). The Supreme Court's reasoning

---

3. Our holding is consistent with *Vasquez v. Hillery*, 474 U.S. 254, 258–60, 106 S.Ct. 617, 620–22, 88 L.Ed.2d 598 (1986). There, the Supreme Court held that a habeas petitioner had not circumvented his obligation to exhaust state remedies by presenting expert statistical analysis to support his claim that the indicting grand jury systematically excluded blacks. The Court noted that the evidence was not "new," because it "added nothing to the case that this court has not considered intrinsic to the consideration of any grand jury discrimination claim." *Id.* at 259, 106 S.Ct. at 621. In addition, the Court relied on the fact that the district court had requested the evidence pursuant to its power to expand the existing evidentiary record under

Rule 7(b), 28 U.S.C. foll. § 2254. Here, by contrast, the new evidence was presented by the habeas petitioner on his own initiative, and the evidence places his claim in a significantly different and stronger evidentiary posture than it had when presented in state court. For instance, Dr. Shipp's evidence controverts the live testimony given by officers Mullen and Chase at the 1967 hearing. Accordingly, we find *Vasquez* to be distinguishable and *Granberry* and *Dispensa* controlling.

1. Census figures for 1910 through 1960 had been considered in the state court. 533 F.Supp. at 1199 n. 21.

in rejecting the lack of exhaustion argument echoes that of the district court. 474 U.S. at 258–59, 106 S.Ct. at 620–21.

In determining whether the "new" evidence presented by the petitioner requires a remand to the state court under the *Vasquez v. Hillery* test, it is important to understand exactly how that evidence relates to the issue decided in the prior state court proceedings. It is my view that Dr. Shipp's affidavit, like the expert analysis in *Hillery*, is "simply an expert analysis of evidence already before the court." This case does *not* raise the issue of whether Aiken asked for counsel or what the substance of the colloquy was; the parties agree that the requests for counsel *could* have been heard by the officers and that the officers responded appropriately to statements immediately preceding the request. The only issue is whether Aiken's request was deliberately ignored by officers who, in fact, heard the request. The issue is thus one of credibility, and unless Dr. Shipp's affidavit can be said to undermine the trial court's finding that the officers were truthful in saying they did not hear the request (and therefore did not deliberately ignore it), it does not "fundamentally alter" the claim which Aiken has already presented to the state courts.

When the original tape was played on the original recording device at the trial, neither the judge, the prosecution, nor the defense counsel heard the requests. It was only afterward, using a new machine, that it became apparent that Aiken had, in fact, requested counsel; even then his requests were difficult to discern.[2] It was at that point that the supplemental hearing was ordered for the specific purpose of determining whether the officers had heard and deliberately ignored Aiken's request. At that hearing, both officers testified that they did not hear any requests for counsel. They also testified that Aiken's manner of speech made him difficult to understand. There was testimony that the interview room was not soundproof and that extraneous noises might have interfered with the officers' ability to hear what Aiken was saying. The tape was played repeatedly on both the original recorder and a new machine. Aiken was able to cross-examine the witnesses and to bring out the fact that the officers had responded without difficulty to his other statements.

Dr. Shipp's affidavit establishes that the decibel counts of Aiken's requests for counsel were higher (louder) than were the immediately preceding statements to which the officers responded appropriately. This, however, does not undermine the credibility determination made by the state court.[3] Federal habeas courts are explicitly enjoined from redetermining matters of credibility. *Marshall v. Lonberger*, 459 U.S. 422, 434–35, 103 S.Ct. 843, 851, 74 L.Ed.2d 646 (1983). The merits of this evidentiary dispute were resolved in a full, fair, and adequate state hearing. If Aiken had been prevented by the court from directing inquiry along the lines of the analysis later performed by Dr. Shipp, the integrity of the proceeding might reasonably be called into question. That was not the case, however, and under the circumstances which did occur, I am unable to say that Dr. Shipp's evidence so changed the nature of Aiken's claim that it requires yet another round of litigation before it can be said that Aiken received a full and fair hearing on the issue. Accordingly, I would affirm the denial of the writ.

---

**2.** In fact, a complete transcript of the interrogation was not obtained until after Dr. Shipp analyzed the tape using a variety of physical and electronic sound-enhancement techniques.

**3.** The decibel count is, in a sense, some scientific confirmation that the human ears *could* have heard the requests. However, it does not at all establish that the human ears *did* in fact hear and understand that a request was being made. The decibel count is significant, but of far more significance are the conditions of human auditory sensitivity, mental concentration and the receipt and translation of sound.