Opinion by Judge N.R. SMITH; Dissent by Judge REINHARDT.
OPINION
N.R. SMITH, Circuit Judge:
Gregory Scott Dickens, an Arizona state prisoner, appeals the district court’s denial of his 28 U.S.C. § 2254 habeas corpus petition. Dickens was sentenced to death on each of two counts of felony murder for the 1991 killings of Bryan and Laura Bernstein. In this petition, Dickens challenges his capital sentences, arguing that (1) the Arizona Supreme Court’s application of Enmund v. Florida, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982), and Tison v. Arizona, 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987), was unreasonable; (2) the Arizona Supreme Court based its decision on an unreasonable determination of the facts; and (3) his trial counsel rendered ineffective assistance by failing to investigate and present certain mitigating evidence during sentencing.[1]
Regarding Dickens’s first two arguments, we must affirm, because (1) the Arizona Supreme Court’s application of Enmund and Tison to the facts of this case was not objectively unreasonable and (2) the Arizona Supreme Court did not base its decision on a clearly erroneous determination of the facts. As for Dickens’s third argument, although we agree that Dickens defaulted on his ineffective assistance of counsel claim by failing to fairly present the claim to the Arizona courts, we vacate and remand to allow the district court to reassess whether Dickens has established cause and prejudice for the procedural default under Martinez v. Ryan, — U.S. ---, 132 S.Ct. 1309, 182 L.Ed.2d 272 (2012).
Background[2]
In January 1990, while working as a counselor at the Oak Grove Institute in Temecula, California, Dickens became acquainted with then fourteen-year-old Travis Amaral. Amaral lived at Oak Grove, which is a placement center for violent juveniles. Dickens worked with Amaral and learned that he was a “high risk” patient with a “violent and explosive temper.” Dickens also learned that Amaral battered a nurse and frequently bragged about carrying guns and being involved in several murders. Dickens quit working at Oak Grove in March 1990 but maintained his friendship with Amaral.
In early September 1991, a few days after Dickens moved to Yuma, Arizona, Amaral contacted Dickens and explained that he was running away from home. Hearing this news, Dickens purchased a bus ticket for Amaral to travel to Yuma. Amaral arrived in Yuma on September 8, 1991. He spent the next several days with Dickens near the Colorado River. While *1058 recreating on the river, Dickens showed Amaral a .38-caliber revolver he had recently acquired. At some point during their time together, Amaral attempted to intimidate Dickens by pointing the loaded revolver at Dickens’s head.
Dickens paid for Amaral’s food and transportation during his visit to Yuma. However, after a couple of days, Dickens was running low on cash. Therefore, on September 10, 1991, while eating dinner at a Hardee’s restaurant in Yuma, Dickens and Amaral discussed “ways to get more money.” Dickens suggested they plan a robbery. They flipped a coin to decide who would conduct the first robbery, and Amaral won. Dickens gave Amaral a choice of several locations to commit the robbery, including a convenience store and a highway rest stop. Amaral chose the rest stop, because it was “out of the way,” less busy, and “easier.”
After leaving the restaurant, Dickens and Amaral drove to a rest area on eastbound Interstate 8, east of Yuma. Dickens removed his .38-caliber revolver from the glove compartment and placed it on the seat of the vehicle. While waiting for the appropriate circumstances to conduct the robbery, an argument ensued between the two. During the argument, Amaral again pointed the revolver at Dickens’s head to intimidate him. After waiting and watching at the rest area for approximately three hours, Dickens and Amaral saw Bryan and Laura Bernstein[3] drive into the parallel westbound rest area across the interstate. Dickens nodded his head and either handed Amaral the handgun or watched him remove it from the seat. They agreed that, after Amaral robbed the Bernsteins, Amaral would run down the westbound ramp of the rest area where Dickens would pick him up.
Sitting in his truck on the opposite side of the highway, Dickens watched Amaral as he crossed the interstate and approached the Bernsteins. When he reached the Bernsteins, Amaral asked if they had the time. Laura responded, “9:17 [p.m.].” Amaral then pointed the gun at Bryan and demanded his wallet, which Bryan surrendered. Amaral then asked Laura for her wallet, but she did not have one. Amaral ordered the Bernsteins to walk past their car and turn around. From the opposite side of the highway, Dickens observed Amaral moving the Bernsteins across the beams of light from their headlamps. Amaral asked if they were ready to die, then shot Laura point blank in the head. Dickens saw the bright flash of the gun as Amaral shot Laura. Laura fell to the ground, and Bryan crouched down over her. Amaral re-cocked the revolver, pointed it at Bryan, and shot him in the head.
After seeing that Amaral had robbed and shot the Bernsteins, Dickens drove across the median and through the rest area. No evidence suggests Dickens stopped to aid the Bernsteins, called for emergency medical assistance, or otherwise notified the authorities. Dickens picked Amaral up on the westbound side of highway and asked, “Do you have the wallet?” Amaral replied that he did and handed the wallet to Dickens. After searching the wallet and returning it to Amaral, Dickens explained that he had driven through the rest area to make sure “everything was taken care of.” They then drove to the home of Dickens’s brother, where Amaral removed cash, traveler’s checks, and one credit card from Bryan’s wallet. Dickens and Amaral burned the wallet and its remaining contents. They *1059 split the cash, Amaral pocketed the credit card, and they later destroyed the traveler’s checks.
At approximately 9:40 p.m., a deputy sheriff drove into the rest area and found the Bernsteins lying on the ground in front of their vehicle. Laura was dead. Bryan, suffering from a gunshot wound to the head, was semiconscious, thrashing around, and moaning in pain. Bryan told the deputy that he had been threatened with a gun, attacked, and thought he was shot. Bryan died shortly thereafter.
On September 11 (the morning following the murders), Amaral unsuccessfully attempted to use Bryan’s credit card at a local K-Mart. That evening, Dickens rented a room at a Motel 6, where he and Amaral spent the night. Early the next morning, Dickens and Amaral parted company. Dickens drove to Carlsbad, California, and Amaral went back to his mother’s house.
They met up again in March 1992. At that time, Amaral moved in with Dickens for one to two weeks in a San Diego, California apartment. Amaral’s mother, finding that Amaral had left her home, reported Amaral as a runaway and gave Dickens’s address to the police. The police conducted an investigation into sex abuse charges against Dickens. San Diego police officers eventually arrested Dickens on charges of sexually abusing Amaral (and other boys) and assault with a deadly weapon.[4] During-an interview concerning the alleged abuse, Amaral told officers that he and Dickens had been involved in a double homicide in Yuma.
In April 1992, after further investigation, Dickens was indicted for two counts of premeditated first-degree murder, two counts of felony first-degree murder, one count of conspiracy to commit first-degree murder, one count of conspiracy to commit armed robbery, and two counts of armed robbery. After a trial, he was acquitted of premeditated murder and conspiracy to commit murder but convicted of the felony murders and armed robberies of Bryan and Laura Bernstein, as well as conspiracy to commit armed robbery. Finding no mitigating factors sufficient to call for leniency, the district court sentenced Dickens to death on the felony murder counts.[5] The court further ordered that, if the sentences were ever reduced, the sentences would be served consecutively. The court also sentenced Dickens to fourteen years’ imprisonment on the conspiracy and armed robbery convictions, to be served consecutively to the death sentences.
Dickens applied for post-conviction relief from the trial court, which the trial court denied. Dickens then appealed his conviction and sentence to the Arizona Supreme Court. That court affirmed, noting that overwhelming evidence supported the conviction and capital sentences and emphasizing that “this is not a case of lingering doubt.” State v.. Dickens, 187 Ariz. 1, 926 P.2d 468, 493 (1996) (in banc). Dickens subsequently filed a petition for writ of habeas corpus under 28 U.S.C. § 2254 with the U.S. District Court for the District of Arizona, which the district court denied. We review de novo the district court’s order denying the petition. Estrada v. Scribner, 512 F.3d 1227, 1235 (9th Cir. *1060 2008). Because the relevant state court determination for a habeas petition is the last reasoned state court decision, our review focuses on the Arizona Supreme Court’s decision. See Delgadillo v. Woodford, 527 F.3d 919, 925 (9th Cir.2008) (citing Y1st v. Nunnemaker, 501 U.S. 797, 804-06, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991)).
I. The Arizona Supreme Court’s application of Enmund/Tison to the facts of this case was not objectively unreasonable
Dickens argues the Arizona Supreme Court’s application of federal law regarding capital sentences for felony-murder defendants was unreasonable and therefore warrants habeas relief. He specifically contends that his contribution to the murders of Bryan and Laura Bernstein was insufficient to warrant the death penalty. To obtain relief under the Antiterrorism and Effective Death Penalty Act of 1996 (“AEDPA”), Pub.L. No. 104-132, 110 Stat. 1214, Dickens must show that the Arizona Supreme Court’s decision (1) was “contrary to” clearly established federal law as determined by the Supreme Court, (2) “involved an unreasonable application of such law,” or (3) “was based on an unreasonable determination of the facts in light of the record before the state court.” Harrington v. Richter, — U.S. -, 131 S.Ct. 770, 785, 178 L.Ed.2d 624 (2011) (quoting 28 U.S.C. § 2254) (internal quotation marks omitted).
“A decision is ‘contrary to’ federal law when the state court applies a rule of law different from that set forth in the holdings of Supreme Court precedent or when the state court makes a contrary determination on ‘materially indistinguishable’ facts.” Earp v. Ornoski, 431 F.3d 1158, 1182 (9th Cir.2005) (quoting Williams v. Taylor, 529 U.S. 362, 405-06, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000)). “[T]o determine whether a state court failed to apply ‘clearly established Federal law' ... we must distinguish between situations where a legal principle established by a Supreme Court decision clearly extends to a new factual context ... and where it does not....” Moses v. Payne, 555 F.3d 742, 753 (9th Cir.2009). When Supreme Court “cases give no clear answer to the question presented, ... it cannot be said that the state court unreasonably applied clearly established Federal law.” Wright v. Van Patten, 552 U.S. 120, 126, 128 S.Ct. 743, 169 L.Ed.2d 583 (2008) (internal quotation marks and citations omitted). “[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.” Lockyer v. Andrade, 538 U.S. 63, 75-76, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003) (internal quotation marks and citation omitted). “Rather, that application must be objectively unreasonable.” Id. at 76, 123 S.Ct. 1166.
The applicable rules in this case come from Enmund, 458 U.S. 782, 102 S.Ct. 3368, and Tison, 481 U.S. 137, 107 S.Ct. 1676, which were both decided prior to Dickens’s 1993 conviction. In Enmund, the Supreme Court reversed the death sentence of a defendant convicted under Florida’s felony-murder rule. 458 U.S. at 798, 102 S.Ct. 3368. Enmund drove the getaway car in an armed robbery of a dwelling. His accomplices murdered an elderly couple who resisted the robbery. Id. at 784-86, 102 S.Ct. 3368. The Court determined that Enmund “did not commit the homicide, was not present when the killing took place, and did not participate in a plot or scheme to murder.” Id. at 795, 102 S.Ct. 3368. Therefore, the Court concluded that putting Enmund to death, “to avenge two killings that he did not commit and had no intention of committing or causing,” would not achieve the deter *1061 rent or retributive goals of the death penalty and was therefore unconstitutional. Id. at 800-01, 102 S.Ct. 3368.[6]
Tison created an exception to Enmund for felony-murder defendants whose “[1] major participation in the felony committed, [2] combined with reckless indifference to human life, is sufficient to satisfy the Enmund culpability requirement.” 481 U.S. at 158, 107 S.Ct. 1676. The defendants in Tison helped their father and his cellmate — both convicted murderers — escape from prison, armed them with shotguns, helped flag down and kidnap a family on an isolated road, drove the family to a remote site, and then stood by as their father and his cellmate murdered the four family members. Id. at 139-41, 107 S.Ct. 1676. The Court distinguished Enmund, explaining that the defendant in that case “did not actively participate in the events leading to death (by, for example, as in the present case, helping abduct the victims) and was not present at the murder site.” Id. at 145, 107 S.Ct. 1676. By contrast, the Tison defendants were major participants in the felony committed because: (1) they “actively participated in the events leading to the death by, inter alia, providing the murder weapons and helping abduct the victims”; (2) they were “present at the murder site, [and] did nothing to interfere with the murders”; (3) they “ma[de] no effort to assist the victims before, during, or after the shooting”; (4) “after the murders [they] continued on the joint venture”; and (5) they “could anticipate the use of lethal force” during the commission of their crimes. Id. at 145, 151-52, 107 S.Ct. 1676. Therefore, the Tison Court concluded the defendants’ participation was sufficient to warrant capital punishment. Id. at 158, 107 S.Ct. 1676.[7]
A. Major participation
The Arizona Supreme Court determined that Dickens was a major participant in the murder of Bryan and Laura Bernstein, because: (1) “[t]he robberies were premeditated, planned, and agreed on by [Dickens] and Amaral”; (2) “[Dickens] furnished Amaral with the weapon used in the murders or knew Amaral had the weapon with him for the robberies”; (3) “[Dickens] drove Amaral to the scene”; (4) “[Dickens] waited while Amaral committed the robberies”; (5) “[Dickens] picked up Amaral after the crime”; and (5) “[Dickens] witnessed the destruction of evidence, and failed to report the crimes.” Dickens, 926 P.2d at 490. The Arizona court’s application of federal law was not objectively unreasonable, because Dickens’s conduct nearly matches that of the Tison defendants. Dickens was actively involved in every aspect of the deadly crime — planning the robbery, staking out the crime scene, targeting the victims, arming Amaral with a handgun,[8] watching *1062 the murders, aiding Amaral’s escape, destroying evidence, and helping Amaral evade capture. Dickens was clearly a major participant in the crime.
Nonetheless, Dickens argues his conduct was more akin to the defendant in Enmund, than to the defendants in Tison. Most notably, he argues that Enmund and Tison require a defendant’s immediate physical presence at the murder scene to qualify for the death penalty. However, nowhere in Enmund or Tison does the Supreme Court clearly establish that “presence” at a murder scene is a mandatory prerequisite for the death penalty. Instead, physical presence is one of several factors relevant to the “major participation” prong of the Tison analysis. 481 U.S. at 158, 107 S.Ct. 1676. In addition to their presence at the murder scene, the defendants in Tison were “actively involved in every element” of the crime because, among other things, they (1) helped plan the underlying crimes (kidnaping and robbery), (2) provided the murder weapons, (3) made no effort to assist the victims after the shooting, (4) helped the perpetrators flee, and (5) continued in the criminal venture after the murders were committed. Id. at 145, 151-52, 158, 107 S.Ct. 1676. The Tison Court never stated that one factor was more important than another factor; it simply concluded that the defendants’ actions collectively demonstrate a “high level of participation ... [that] implicates them in the resulting deaths.” Id. at 158, 107 S.Ct. 1676.
By sharp contrast, “the only evidence of the degree of [Enmund’s] participation [was] the jury’s likely inference that he was the person in the car by the side of the road near the scene of the crimesf,] ... waiting to help the robbers escape.... ” Enmund, 458 U.S. at 786, 102 S.Ct. 3368. There was no evidence that Enmund provided the murder weapons, knew of the shooters’ violent propensities, planned the underlying crime, or continued to assist the perpetrators after they murdered their victims. His only participation was that of getaway driver. Id. at 786 n. 2, 102 S.Ct. 3368.
Here, the facts support the Arizona Supreme Court’s determination that Dickens’s participation was similar to that of the defendants in Tison, rather than the defendant in Enmund. “Far from merely sitting in a car away from the actual scene of the murders,” Tison, 481 U.S. at 158, 107 S.Ct. 1676, Dickens planned the underlying armed robbery, provided the murder weapon or knew Amaral had the weapon, watched Amaral shoot the victims, made no effort to assist the victims after the shooting, helped Amaral flee the scene, assisted in the destruction of evidence, continued in the criminal venture after the murders were committed, and failed to report the murders to the authorities. These facts, taken together, demonstrate a “high level of participation ... [that] implicates [Dickens] in the resulting deaths.” Tison, 481 U.S. at 158, 107 S.Ct. 1676. Dickens was no doubt a “major participant.”
Additionally, even if Tison and Enmund could be read to incorporate a mandatory “presence” requirement, it seems that the Arizona Supreme Court suggested that Dickens met that requirement. The Supreme Court has never defined the word “presence” as it pertains to the major participation in a capital crime. The Arizona Supreme Court had as its guide only the two contrasting examples of presence in *1063 Enmund, and Tison. In Enmund, where the defendant sat in a car outside the home where two victims were shot to death and neither heard nor observed the murders, the Court concluded the defendant “was not present when the killing took place.” 458 U.S. at 795, 102 S.Ct. 3368. In Tison, where the defendants stood by as four people were gunned down, the Court determined the defendants were sufficiently “present” at the murder site. 481 U.S. at 145, 107 S.Ct. 1676. It is not clear how close the Tison defendants stood to the victims when they were murdered, but we can fairly assume they were close enough to watch the crime as it happened.[9]
Here, Dickens testified at trial that he watched each part of the Bernsteins’ murders as they unfolded. After planning the armed robbery, staking out the rest area for several hours in search of potential victims, and selecting the Bernsteins as they parked on the opposite side of the highway, Dickens (1) watched Amaral leave the truck with a loaded .38-caliber handgun, knowing Amaral was going to rob the Bernsteins at gunpoint; (2) watched Amaral walk across the highway; (3) observed Amaral moving the Bern-steins around the front of their car in the path of the illuminated headlamps; and (4) saw flashes as Amaral shot the victims in the head. Dickens then drove through the rest stop to pick Amaral up, and (to use his words) verify “everything had been taken care of’ (i.e., verify the victims had been shot). Given the language of the Supreme Court in Tison, Dickens was present at this murder. In any event, because Supreme Court “cases give no clear answer to the question” of mandatory or minimum presence at the murder scene, “it cannot be said that the state court unreasonably applied clearly established Federal law.” Wright, 552 U.S. at 126, 128 S.Ct. 743 (internal quotation marks, alterations, and citations omitted). Therefore, the Arizona Supreme Court’s determination that Dickens was a major participant in the murders did not rest on an objectively unreasonable application of Supreme Court precedent. Lockyer, 538 U.S. at 76, 123 S.Ct. 1166.
B. Reckless indifference to human life
The second prong of the Tison analysis requires the felony-murder defendant to exhibit “reckless indifference to human life” sufficient to satisfy Enmund’s culpability requirement for capital punishment. 481 U.S. at 158, 107 S.Ct. 1676. The Tison Court observed that
some nonintentional murderers may be among the most dangerous and inhumane of all — the person who tortures another not caring whether the victim lives or dies, or the robber who shoots someone in the course of the robbery, utterly indifferent to the fact that the desire to rob may have the unintended consequence of killing the victim as well as taking the victim’s property. This reckless indifference to the value of human life may be every bit as shocking to the moral sense as an “intent to kill.” Indeed it is for this very reason that the common law and modern criminal codes *1064 alike have classified behavior such as occurred in this ease along with intentional murders.
Id. at 157, 107 S.Ct. 1676 (citations omitted). The Court held that “reckless disregard for human life implicit in knowingly-engaging in criminal activities known to carry a grave risk of death represents a highly culpable mental state” sufficient to warrant capital punishment “when that conduct causes its natural, though also not inevitable, lethal result.” Id. at 157-58, 107 S.Ct. 1676 (emphasis added). The Court further noted that a defendant’s major participation in a dangerous felony “often provide[s] significant support” for a finding of reckless indifference. Id. at 158 n. 12, 107 S.Ct. 1676.
Applying Tison, the Arizona Supreme Court concluded that Dickens acted with a reckless indifference to human life because, (1) in addition to the factors demonstrating his major contribution to the crimes, Dickens (2) armed Amaral with the .38-caliber revolver, (3) knowing that “Amaral had a violent and explosive temper,” and (4) “failed to render aid” to the Bernsteins. Dickens, 926 P.2d at 490.[10] Given these facts, the Arizona Supreme Court’s conclusion that Dickens exhibited a reckless indifference to human life was not objectively unreasonable.
Dickens argues this conclusion was unreasonable, because armed robbéry is-not a crime “known to carry a grave risk of death.” However, Dickens failed to cite any U.S. Supreme Court precedent, and we know of none, clearly establishing this principle. Moreover, even if the garden variety armed robbery were not known to carry a grave risk of death, the question here is whether the circumstances of Dickens’s crime were known to carry a grave risk of death and caused their “natural, though also not inevitable, lethal result.” Tison, 481 U.S. at 157, 107 S.Ct. 1676.
Like the armed robbery in Tison, this was no ordinary heist. The facts support the Arizona Supreme Court’s determination that Dickens knew there was a grave risk of death in sending an explosive adolescent with a history of violence to commit armed robbery. From his experience working at the Oak Grove Institute (a treatment center for violent juveniles), Dickens knew that Amaral was a high risk patient with a “violent and explosive temper.” Dickens, 926 P.2d at 490. He knew that Amaral had beaten up a nurse at Oak Grove and had a long history of carrying guns. Amaral twice attempted to intimidate Dickens — once at the river and once immediately before the robbery — by pointing the loaded .38-caliber revolver at Dickens’s head. Amaral also bragged about being involved in other murders. Even with this knowledge, Dickens proceeded with the robbery. He either furnished Amaral with his .38-caliber revolver, or knew Amaral had the gun, and directed Amaral to rob the Bernsteins on the opposite side of the highway. Like the defendants in Tison, who armed two convicted murderers and helped plan and orchestrate the armed robbery, Dickens “could have foreseen that lethal force might be used” in the course of the robbery. 481 U.S. at 151-52, 107 S.Ct. 1676; accord Foster v. Quarterman, 466 F.3d 359, 370-71 (5th Cir.2006) (denying habeas relief to a death row petitioner convicted of capital murder as an accomplice because he displayed reckless indifference to human life by driving two armed co-conspirators from *1065 victim to victim to commit armed robbery, which is a criminal activity “known to carry a grave risk of death”).
Further, after watching the shootings, Dickens, like the defendants in Tison, chose to “aid [Amaral,] whom he had placed in the position to kill[,] rather than [aid the] victims.” Tison, 481 U.S. at 152, 107 S.Ct. 1676; see id. (“These facts not only indicate that the Tison brothers’ participation in the crime was anything but minor; they also would clearly support a finding that they both subjectively appreciated that their acts were likely to result in the taking of innocent life.”). Dickens helped Amaral flee the scene of the murder, destroy evidence, and evade capture.
In light of these facts, we cannot say that the Arizona Supreme Court’s determination that Dickens exhibited a reckless indifference to human life rested on an objectively unreasonable application of Enmund and Tison.
II. The Arizona Supreme Court’s decision was not based on an unreasonable determination of the facts in light of the evidence presented at trial
Dickens argues that the Arizona court’s Enmund/Tison analysis was based on an unreasonable determination of the facts, because (1) Amaral was not a credible witness; and (2) there was no evidence that (a) Dickens knew Amaral intended to rob or kill the Bernsteins, (b) Dickens knew of Amaral’s violent propensities, or (c) Dickens knew one of the victims might still be alive when he and Amaral left the rest area. Dickens “may obtain relief only by showing the [Arizona court’s] conclusion to be ‘an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.’” Miller-El v. Dretke, 545 U.S. 231, 240, 125 S.Ct. 2317, 162 L.Ed.2d 196 (2005) (quoting 28 U.S.C. § 2254(d)(2)).
Dickens recites testimony and evidence presented at trial showing inconsistent statements from Amaral, contradictory testimony from Amaral’s fellow prisoners, and the jury’s ultimate rejection of Amaral’s testimony about an alleged walkie-talkie conversation between Dickens and Amaral at the murder scene.[11] Aside from casting doubt on Amaral’s credibility — a factor which the state court and jury no doubt considered at trial[12] — these general allegations do little more than attempt to relitigate the jury’s factual findings and credit Dickens’s testimony (over that of Amaral) that Dickens had no part in the crimes. We agree with the Arizona Supreme Court that we must “defer to the jury and the [trial] judge regarding Amaral’s credibility.” Dickens, 926 P.2d at 490; see United States v. Johnson, 229 F.3d 891, 894 (9th Cir.2000) (“[W]e are powerless to question a jury’s assessment of witnesses’ credibility....” (internal quotation marks omitted)). Absent persuasive evidence that any particular determination of fact was unreasonable, Dickens cannot prevail under § 2254(d)(2) by raising a general challenge to Amaral’s credibility.
As to Dickens’s specific factual challenges, sufficient evidence presented at *1066 trial supported the Arizona Supreme Court’s findings to make those findings reasonable. Dickens first argues that no evidence in the record supports the Arizona courts’ determination that he knew about or helped plan the robbery. However, Amaral testified at length about their common scheme to commit armed robbery. Dickens has not explained why the Arizona courts’ reliance on this particular testimony from Amaral was unreasonable. Moreover, Dickens himself testified that he knew about the robbery. Dickens admitted at trial and to police investigators that he and Amaral staked out the rest area on the west side of the highway, he saw the victims when they pulled into the rest area, he watched Amaral take the revolver as he walked away from the vehicle, and he watched Amaral shoot the victims across the highway. Most significantly, Dickens also admitted that (1) he “figured [Amaral] was going to ... go over there and rob those people” when Amaral left the truck, and (2) Amaral told him he was going to rob the Bernsteins. In light of this evidence, the Arizona Supreme Court’s determination that Dickens knew about and agreed to the robbery was not unreasonable.
Second, Dickens argues the evidence in the record does not support the Arizona courts’ determination that he knew about Amaral’s violent propensities. This is plainly incorrect. Dickens originally met Amaral at the Oak Grove Institute for violent juveniles. Dickens learned, while working at Oak Grove, that Amaral was a “high risk” patient, had battered a nurse, and frequently bragged about carrying guns and committing violent crimes, including murder. He further testified that he had personally seen Amaral carrying guns on several occasions before the September 1991 murders. Lastly, Amaral twice pointed the loaded .38-caliber revolver at Dickens’s head to intimidate him. In light of Dickens’s own admissions, we cannot say the Arizona Supreme Court’s determination that Dickens knew of Amaral’s violent nature was unreasonable.
Finally, Dickens argues that no evidence in the record supports the Arizona courts’ determination that Dickens “failed to render aid knowing that one victim might not be dead.” This finding relates to the Arizona Supreme Court’s determination that Dickens exhibited a reckless indifference to human life, but it was not a dispositive factor in that determination. In Tison, the U.S. Supreme Court concluded that the defendants exhibited reckless indifference, in part, because they “watched the killing” and then “chose to aid those whom [they] had placed in the position to kill rather than their victims.” 481 U.S. at 152, 107 S.Ct. 1676. Nothing suggests the defendants in Tison knew anyone had survived; rather, the deciding factors were the defendants’ (1) knowledge that victims had been shot and (2) decision to aid the shooters over the victims. Dickens, like the Tison defendants, watched Amaral shoot the Bernsteins, but decided to aid Amaral over the Bernsteins. There is no evidence that Dickens attempted to aid the Bernsteins, summoned medical assistance, or otherwise notified the authorities. Instead, he helped Amaral flee the scene, destroy evidence, and evade capture. Because Dickens’s uncontested knowledge of the Bernsteins’ shooting (rather than Bryan’s survival) is the critical factor in the Enmund/Tison reckless indifference analysis, the Arizona Supreme Court did not “base” its decision on an unreasonable determination of the facts. See 28 U.S.C. § 2254(d)(2).[13]
*1067 III. Dickens defaulted on his ineffective assistance of counsel claim by failing to fairly present the claim to the Arizona courts, but he may have shown cause under Martinez v. Ryan
Dickens lastly petitions this court for habeas relief on the basis of his counsel’s ineffective assistance during sentencing. Dickens argues his counsel failed to conduct a thorough investigation of Dickens’s background and prepare the defense expert with the necessary tools to present compelling mitigation evidence. The district court determined that this argument was procedurally defaulted, because it was not exhausted in state court. “A federal court may not grant habeas relief to a state prisoner unless he has properly exhausted his remedies in state court.” Peterson v. Lampert, 319 F.3d 1153, 1155 (9th Cir.2003) (citing 28 U.S.C. § 2254(b); Coleman v. Thompson, 501 U.S. 722, 731, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991)). To demonstrate that he exhausted his federal habeas corpus claim in state court, Dickens’s “claim ... must include reference to a specific federal constitutional guarantee, as well as a statement of the facts that entitle [him] to relief.” Gray v. Netherland, 518 U.S. 152, 162-63, 116 S.Ct. 2074, 135 L.Ed.2d 457 (1996).
A. Fair presentation in state court
Constitutional claims must be “fairly presented” in state court to provide those courts an opportunity to act on them. Duncan v. Henry, 513 U.S. 364, 365, 115 S.Ct. 887, 130 L.Ed.2d 865 (1995) (per curiam). “It would be contrary to [the] purpose [of Section 2254(b)] to allow a petitioner to overcome an adverse state-court decision with new evidence introduced in a federal habeas court and reviewed by that court in the first instance effectively de novo.” Cullen v. Pinholster, 563 U.S. -, 131 S.Ct. 1388, 1399, 179 L.Ed.2d 557 (2011). Therefore, a claim has not been fairly presented in state court if new factual allegations (1) “fundamentally alter the legal claim already considered by the state courts,” Vasquez v. Hillery, 474 U.S. 254, 260, 106 S.Ct. 617, 88 L.Ed.2d 598 (1986); Beaty v. Stewart, 303 F.3d 975, 989-90 (9th Cir.2002), or (2) “place the case in a significantly different and stronger evidentiary posture than it was when the state courts considered it,” Aiken v. Spalding, 841 F.2d 881, 883 (9th Cir.1988); accord Nevius v. Sumner, 852 F.2d 463, 470 (9th Cir.1988).
In Aiken, the habeas petitioner presented new evidence (consisting of a decibel sound test performed by an expert) which strengthened his claim that the interrogating officers heard him request counsel. 841 F.2d at 883. The court held that his right to counsel claim was unexhausted, because the new decibel evidence “substantially improve[d] the evidentiary basis for [his] right-to-counsel and voluntariness arguments, thereby presenting the very type of evidence which the state should consider in the first instance.” Id. Similarly, in Nevius, this court held that a habeas petitioner failed to exhaust his Bat-son claim in state court where he attempted to introduce new and substantial supporting evidence on appeal. 852 F.2d at *1068 469-70. At oral argument and in his appellate briefs, Nevius made
serious allegations concerning comments by the prosecutor alleged to have been made to defense counsel sometime during 1986. Those representations, if proven, might have presented in a different light the factual issues concerning the motivation of the prosecutor in exercising his peremptory challenges. The alleged remarks, however, ... have not been presented to the state courts, either on appeal or during post-conviction proceedings. In habeas proceedings, the federal courts are not free to entertain new evidence that places the claim in a significantly different posture, when that evidence was never presented to the state courts....
If there is evidence that should be presented to the state courts, then the attempt must first be made to present it there and to make a record. Only thereafter, under the appropriate procedural strictures, may the matter be addressed in federal court.
Id. (emphasis added) (internal citations omitted).[14]
In this case, Dickens argued to the Arizona trial court that his sentencing counsel provided ineffective assistance. Dickens claimed, among other things, that sentencing counsel did not direct the work of the court-appointed psychologist, Dr. Todd A. Roy, and did not adequately investigate Dickens’s background. In preparation for his testimony, sentencing counsel provided Dr. Roy with several boxes of material documenting Dickens’s history. Dr. Roy later “adduced information from [Dickens] relative to a possible medical or mental condition.” However, Dickens alleged that sentencing counsel (1) “conducted no investigation whatsoever into the possibility [Dickens] was suffering from any medical or mental impairment,” and (2) failed to direct Dr. Roy to any particular mitigating evidence. The trial court rejected this claim on the merits, finding that sentencing counsel’s performance was not constitutionally deficient and that Dickens “failed to demonstrate that he was prejudiced by any performance of defense counsel.” Considering the same arguments raised to the trial court, the Arizona Supreme Court summarily denied Dickens’s Strickland claim on appeal.
In federal court, Dickens changed his claim to include extensive factual alle *1069 gations suggesting Dickens suffered from Fetal Alcohol Syndrome (“FAS”) and organic brain damage. Dickens argues that sentencing counsel’s failure to uncover and present these specific mitigating conditions amounted to constitutionally deficient performance under Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). This new evidence creates a mitigation case that bears little resemblance to the naked Strickland claim raised before the state courts. There, Dickens did not identify any specific conditions that sentencing counsel’s allegedly deficient performance failed to uncover, averring only generally that sentencing counsel did not effectively evaluate whether Dickens “suffer[ed] from any medical or mental impairment.” Evidence of specific conditions (like FAS and organic brain damage) clearly places Dickens’s Strickland claim in a “significantly different” and “substantially improved evidentiary” posture. See Nevius, 852 F.2d at 470; Aiken, 841 F.2d at 883. As such, the Arizona courts did not have a fair opportunity to evaluate Dickens’s ineffective assistance of counsel claim. Therefore, the district court correctly determined that Dickens’s newly-enhanced Strickland claim is procedurally barred.
Dickens argues the district court erred, because he established a sufficient factual basis to exhaust his claim in state court according to the Ninth Circuit’s holdings in Weaver v. Thompson, 197 F.3d 359 (9th Cir.1999), Pinholster v. Ayers, 590 F.3d 651 (9th Cir.2009) (en banc), reversed on other grounds, Cullen, 131 S.Ct. at 1398, and Lopez v. Schriro, 491 F.3d 1029 (9th Cir.2007). His reliance on these cases is misplaced. In Weaver, we rejected the argument that a habeas petitioner failed to exhaust his claim in state court, because he modified the factual basis for his bailiff misconduct claim on appeal. 197 F.3d at 364-65. As we explained, “Weaver’s inability to fully explore what transpired during that incident [between the bailiff and the jury] stemmed from the state courts’ refusal to grant him an evidentiary hearing on the matter, rather than from any failure of diligence on his part.” Id. at 364. We noted further that the petitioner “pressed this same claim” before the state and federal courts: the bailiff made an inappropriate comment that coerced the jury into rendering a premature decision, which violated Weaver’s due process and equal protection rights. Id. The only change in Weaver’s claim was the precise wording of the bailiffs comment, which was clarified at the evidentiary hearing. Id.
In Pinholster, we determined that a habeas petitioner’s ineffective assistance of sentencing counsel claim was sufficiently exhausted, because: (1) he “exercised diligence in pursuing an evidentiary hearing in state court regarding his mitigation ineffective assistance claim”; and (2) “both the federal and the state habeas petitions detail many substantially identical facts, including ... Pinholster’s home life as a child, and Pinholster’s educational, medical, social, psychological, and family background.” 590 F.3d at 668-69 (emphasis added). We further noted that, “[although Pinholster substituted experts during the proceedings who ultimately developed different mental impairment theories, these experts nonetheless relied on the same background facts that Pinholster presented to the state court.” Id. at 669 (emphasis added).
Finally, in Lopez, we held that a capital habeas petitioner exhausted his Strickland claim in state court, because he asserted sufficient evidence of the mitigating conditions to the state court. 491 F.3d at 1041. Lopez argued in federal court that his post-conviction counsel failed to uncover and present evidence of organic brain damage, dysfunctional childhood, and alco *1070 hol abuse. Id. at 1040-41. We concluded that this argument was properly exhausted, because “the state court record con-tainted] some evidence of a dysfunctional childhood and alcoholism.” Id. at 1041. However, we did not allow Lopez to supplement the record with additional evidence of prejudice on his ineffective assistance of sentencing counsel claim. Id. at n. 8 (“We note that Lopez apparently wishes to supplement the record in federal court with additional evidence ... that was not presented to the state courts. On remand, the district court will therefore need to determine whether Lopez ... is entitled to supplement the record....”) (citing 28 U.S.C. § 2254(e)(2)). Thus, Lopez did not determine whether a habeas petitioner can add evidence to his claim on federal appeal that would render the claim unexhausted.
This case is distinguishable from Weaver, Pinholster, and Lopez. Dickens’s factual allegations in federal court do not (1) amount to a minor change in the semantics of already-presented evidence, see Weaver, 197 F.3d at 364-65; (2) present “substantially identical facts” to those alleged in state court, see Pinholster, 590 F.3d at 668-69; or (3) build upon the same background evidence presented in state court, see Lopez, 491 F.3d at 1041. Dickens never discussed his mother’s alcohol consumption during pregnancy or any specific circumstances that would have caused organic brain damage in state court. He also does not dispute that he never specifically raised FAS or organic brain damage as mitigating factors in state court. Thus, Dickens’s new factual allegations do not build upon specific factual allegations made in state court. This case is similar to Smith v. Quarterman, in which the Fifth Circuit determined that a petitioner’s inclusion of new and more specific evidence “regarding [his] childhood and the effects of his substance abuse ... constitute[s] ‘material additional evidentiary support’ ” for his Strickland claim. 515 F.3d 392, 402 (5th Cir.2008) (holding that petitioner’s claim was proeedurally barred).
In sum, Dickens’s Strickland claim is proeedurally barred, because the new evidence of prejudice was not fairly presented to the state courts. This new evidence substantially improves the evidentiary posture of Dickens’s claim in federal court. See Peterson, 319 F.3d at 1156 (“When a prisoner has deprived the state courts of a fair opportunity to pass on his claim and state procedural rules bar him from returning to state court, he has proeedurally defaulted and is ineligible for federal habeas relief unless he can show ‘cause and prejudice.’ ” (citation omitted)).
B. Cause and prejudice
Dickens argues that, even if his claim is unexhausted, the ineffective assistance of his post-conviction relief (“PCR”) counsel — in failing to raise the FAS and organic brain damage claims to the Arizona Supreme Court — constitutes cause to overcome the default. See Coleman, 501 U.S. at 749-50, 111 S.Ct. 2546 (“Under [Wainwright v.] Sykes [433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977) ] and its progeny, an adequate and independent finding of procedural default will bar federal habeas review of the federal claim, unless the habeas petitioner can show ‘cause’ for the default and ‘prejudice attributable thereto’.... ” (citations and internal quotation marks omitted)). To establish cause for a procedural default, “a petitioner must demonstrate that the default is due to an external objective factor that cannot fairly be attributed to him.” Smith v. Baldwin, 510 F.3d 1127, 1146 (9th Cir.2007) (en banc) (internal quotation marks omitted). “Attorney ignorance or inadvertence is not cause, but attorney error rising to the level of an independent *1071 constitutional violation (in the form of ineffective assistance of counsel) does constitute cause.” Moormann v. Schriro, 426 F.3d 1044, 1058 (9th Cir.2005) (citing Coleman, 501 U.S. at 753-54, 111 S.Ct. 2546).
The district court held that Dickens’s ineffective-assistance-of-PCR-counsel claim may not constitute cause to excuse the procedural default of his newly-enhanced ineffective-assistance-of-sentencing-counsel claim. The district court supported its holding by noting that ineffective assistance of PCR counsel cannot rise to the level of an independent constitutional violation sufficient to constitute cause, because there is no constitutional right to counsel in state PCR proceedings. The district court’s conclusion was correct under the then-existing, clear circuit law. See, e.g., Smith, 510 F.3d at 1146-47 (“[B]ecause ‘there is no constitutional right to an attorney in state post-conviction proceedings,’ attorney ineffectiveness ‘in the post-conviction process is not considered cause for the purpose[] of excusing the procedural default at that’ state.” (internal quotation marks, alterations, and citations omitted)); Manning v. Foster, 224 F.3d 1129, 1133 (9th Cir.2000) (“[T]here is no constitutional right to an attorney in state post-conviction proceedings. Therefore, any ineffectiveness of [the defendant’s] attorney in the post-conviction process is not considered cause for the purposes of excusing the procedural default at that stage.” (citation omitted)). As an additional ground for denying Dickens’s claim for cause, the district court cited Murray v. Carrier, 477 U.S. 478, 489, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986), and held that Dickens was required to (but did not) present his claim of ineffective assistance of PCR counsel to the state courts as an independent claim in order for it to be used to establish cause.
However, in Martinez v. Ryan, the Supreme Court found “it ... necessary to modify the unqualified statement in Coleman that an attorney’s ignorance or inadvertence in a postconviction proceeding does not qualify as cause to excuse a procedural default.” — U.S. -, 132 S.Ct. 1309, 1315, 182 L.Ed.2d 272 (2012). Martinez creates a narrow exception to Coleman: “Inadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner’s procedural default of a claim of ineffective assistance at trial.”[15] Id. “Where, under state law, claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding, a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective.” Id. at 1320. The Supreme Court expressly held this to be a narrow equitable ruling and not a constitutional ruling. Id. at 1318-20. For a prisoner to meet this equitable rule establishing cause for a procedural default in a scenario applicable to this case, the prisoner must demonstrate that “counsel in the initial-review collateral proceeding, where the claim should have been raised, was ineffective under the standards of Strickland....” Id. at 1318. In addition, “[t]o overcome the default, a prisoner must also demonstrate that the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit.” Id. at 1318-19 (citing Miller-El v. Cockrell, 537 U.S. 322, 123 S.Ct. 1029, 154 *1072 L.Ed.2d 931 (2003) (describing standards for issuing certificates of appealability)).
Here, Dickens argues that ineffective assistance of his PCR counsel caused the procedural default and Arizona requires ineffective-assistance-of-sentencing-counsel claims to be raised in a defendant’s first collateral proceeding — i.e., an initial-review collateral proceeding. Therefore, the newly announced rule in Martinez may provide a path for Dickens to establish cause for the procedural default of his newly-enhanced claim of ineffective assistance of sentencing counsel, if he can show that the claim is substantial and that his PCR counsel was ineffective under Strickland. Thus, we vacate the district court’s ruling regarding whether cause existed to overcome the procedural default of Dickens’s newly-enhanced claim of ineffective assistance of sentencing counsel. We remand for the district court to consider the issue anew in light of Martinez. See Strategic Diversity, Inc. v. Alchemix Corp., 666 F.3d 1197, 1206 (9th Cir.2012) (“Because the district court did not have the benefit of recent Supreme Court authority, we vacate the ruling on these grounds and remand.”).
Appellees present various arguments why Martinez does not apply to Dickens’s situation. We decline to address ah but one of these arguments based on our remand to the district court to decide the applicability and impact of Martinez.
Appellees argue that Martinez does not apply, because the assertion of ineffective assistance of PCR counsel as cause must itself be exhausted or it is procedurally barred. Without the benefit of Martinez, the district court held that Dickens could not assert his claim of ineffective assistance of counsel as cause without first presenting it (i.e., an independent claim) to the state courts. Although the district court had reasonable grounds for its conclusion, see Edwards v. Carpenter, 529 U.S. 446, 451-54, 120 S.Ct. 1587, 146 L.Ed.2d 518 (2000); Murray, 477 U.S. at 489, 106 S.Ct. 2639, reading the case law supporting such a conclusion with Martinez now indicates that no such requirement exists in the narrow circumstances when Martinez applies.
Martinez’s equitable rather than constitutional ruling and its own factual background lead us to conclude that an ineffective assistance of PCR counsel claim used to establish cause for a procedural default of a claim for ineffective assistance of sentencing counsel need not be exhausted itself. It is true that “ineffective assistance adequate to establish cause for the procedural default of some other constitutional claim is itself an independent constitutional claim.” Edwards, 529 U.S. at 451, 120 S.Ct. 1587 (alterations in original). Further, it is true that “the exhaustion doctrine ... generally requires that a claim of ineffective assistance be presented to the state courts as an independent claim before it may be used to establish cause for a procedural default.” Murray, 477 U.S. at 488-89, 106 S.Ct. 2639 (citation omitted). However, it appears that the first time the petitioner in Martinez argued ineffective assistance of PCR counsel was in his federal habeas petition. See Martinez v. Ryan, 132 S.Ct. at 1314; Martinez v. Schriro, 623 F.3d 731, 734 (9th Cir.2010), rev’d by Martinez v. Ryan, 132 S.Ct. 1309. Notwithstanding, the Supreme Court did not find the claim barred for not being presented to the state courts. Therefore, there seems to be no requirement that the claim of ineffective assistance of PCR counsel as cause for a ineffective-assistance-of-sentencing-counsel claim be presented to the state courts.
Furthermore, as Dickens points out, “[t]he question whether there is cause for a procedural default does not pose any occasion for applying the exhaustion doc *1073 trine when the federal habeas court can adjudicate the question of cause — a question of federal law — without deciding an independent and unexhausted constitutional claim on the merits.” Murray, 477 U.S. at 489, 106 S.Ct. 2639. Martinez describes the claim of ineffective assistance of PCR counsel (in an initial-review collateral proceeding) as cause for the procedural default of a claim for ineffective assistance of sentencing counsel as a “narrow exception” to Coleman, 501 U.S. 722, 111 S.Ct. 2546, and as an equitable ruling, not a constitutional ruling. Martinez, 132 S.Ct. at 1315, 1318-1319. In Martinez, the Supreme Court notes that it did not make a constitutional ruling, and “[a] constitutional ruling would provide defendants a freestanding constitutional claim....” Id. at 1319. In other words, Martinez did not create a constitutional right to effective assistance of counsel in PCR proceedings. Thus, the claim of ineffective assistance of PCR. counsel used to establish cause in the narrow circumstances outlined in Martinez is an equitable claim and not a constitutional claim, see Coleman, 501 U.S. at 755, 111 S.Ct. 2546 (“[T]here is no right to counsel in state collateral proceedings.”), and therefore, the claim for cause need not be exhausted as suggested in Murray.
Even if the exhaustion requirement were to apply, a federal habeas petition may be granted even though a claim is not exhausted if “there is an absence of available State corrective process.... ” 28 U.S.C. § 2254(b)(1)(B)(i); see Teague v. Lane, 489 U.S. 288, 297-98, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989) (petitioner failed to raise a claim at trial or direct appeal, which effectively prevented petitioner from raising the claim in collateral proceedings, resulting in the claim being deemed exhausted); Duckworth v. Serrano, 454 U.S. 1, 3, 102 S.Ct. 18, 70 L.Ed.2d 1 (1981) (“An exception is made [to the exhaustion requirement] only if there is no opportunity to obtain redress in state court or if the corrective process is so clearly deficient as to render futile any effort to obtain relief”). Here, a claim of ineffective assistance of PCR counsel does not fit under any of the grounds for relief in PCR proceedings listed in Arizona Rule of Criminal Procedure 32.1. As such, Dickens cannot claim ineffective assistance of PCR counsel in a second PCR petition in Arizona, creating no opportunity to obtain redress. Thus, the claim of ineffective assistance of PCR counsel in an initial review collateral proceeding; does not itself need to be exhausted when raised as cause for the procedural default of an ineffective-assistance-of-sentencing-counsel claim.
For the foregoing reasons, the judgment of the district court denying Dickens’s petition for writ of habeas corpus is
AFFIRMED in part, VACATED in part, and REMANDED.
The parties shall bear their own costs.

. Dickens raises other uncertified issues on appeal, which we address in a separate Memorandum Disposition filed concurrently with this Opinion.

. These facts are drawn substantially from the Arizona Supreme Court's opinion in State v. Dickens, 187 Ariz. 1, 926 P.2d 468, 474-75 (1996) (in banc). We presume the correctness of the Arizona court's findings unless rebutted by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

. Bryan and Laura were both 22 years old. Married for three years and graduates of Cornell University, they were traveling through Arizona en route to UCLA where they both received fellowships to undertake graduate work.

. This information was not provided to the jury.

. The district court sentenced Dickens to death prior to the Supreme Court’s decision in Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), that juries (rather than courts) must determine the presence or absence of aggravating factors meriting imposition of the death penalty. The procedural rule announced in Ring "does not apply retroactively to cases already final on direct review.” Schriro v. Summerlin, 542 U.S. 348, 358, 124 S.Ct. 2519, 159 L.Ed.2d 442 (2004).

.The Enmund Court, "citing the weight of legislative and community opinion, found a broad societal consensus, with which it agreed, that the death penalty was disproportional to the crime of robbery-felony murder ‘in these circumstances.’ ” Tison, 481 U.S. at 147, 107 S.Ct. 1676 (emphasis added) (quoting Enmund, 458 U.S. at 788, 102 S.Ct. 3368). However, the Court acknowledged that 'TUt would be very different if the likelihood of a killing in the course of a robbery were so substantial that one should share the blame for the killing if he somehow participated in the felony.” Enmund, 458 U.S. at 799, 102 S.Ct. 3368 (emphasis added).

. The Court remanded for further proceedings to determine whether the defendants acted with reckless disregard for human life. Tison, 481 U.S. at 158, 107 S.Ct. 1676.

. The dissent argues that the Arizona Supreme Court did not determine that Dickens armed Amaral. The Arizona Supreme Court noted only that Dickens either furnished the weapon or knew Amaral had the weapon in *1062 its "Death eligibility” discussion. Dickens, 926 P.2d at 490. However, in a different section under the same "Sentencing Issues” section, the Arizona Supreme Court stated that Dickens “was admittedly intimately familiar with Amaral's violent temper and impulsiveness, yet he provided Amaral with a gun____” Id. at 492.

. There was apparently some dispute as to the Tison defendants' involvement in and proximity to the murders: "Ricky claimed to have a somewhat better view than Raymond did of the actual killing. Otherwise, the [Arizona] court noted, Ricky Tison’s participation was substantially the same as Raymond’s.” 481 U.S. at 145, 107 S.Ct. 1676. The defendants may have actually walked away from the murder scene to fetch a water jug for the victims "when [they] started hearing the shots.” Id. at 141, 107 S.Ct. 1676. However, because both defendants "watched Gary Tison and Greenawalt fire in the direction of the victims,” they were sufficiently "present” at the murder scene. Id. at 141, 144-45, 157, 107 S.Ct. 1676 (emphasis added).

. As the Tison Court noted, although the “major participation” and "reckless indifference to human life” requirements are stated separately, "they often overlap.” 481 U.S. at 158 n. 12, 107 S.Ct. 1676. The Arizona Supreme Court thus considered the factors demonstrating major participation as significant support for a finding of reckless indifference to human life.

. Amaral’s testimony regarding the walkietalkie conversation (in which Dickens allegedly instructed Amaral not to leave any witnesses) is irrelevant, because neither the trial court nor the Arizona Supreme Court relied on this testimony in their discussion of the evidence supporting the Enmund/Tison findings. See Dickens, 926 P.2d at 490-91.

. For example, the jury did not convict Dickens of premeditated murder or conspiracy to commit murder, in part, because it did not believe Amaral’s testimony that Dickens ordered him to kill the Bernsteins over a two-way radio.

. Some evidence in the record also supports this factual determination. For example, Amaral testified that Dickens drove through *1067 the rest stop to verify that “everything had been taken care of.” Officers testified that, when they arrived at the rest stop shortly after the shooting, Bryan Bernstein was still alive and “thrashing” around in pain. At a minimum, Dickens failed to provide aid when one victim was, in fact, still alive. Given what the deputy sheriff encountered at the rest area, it is likely that Biyan exhibited signs of life and/or was thrashing around in pain when Dickens drove through the rest area. Nonetheless, we need not determine whether the Arizona courts’ determination was reasonable, because this finding is not critical to the Enmund/Tison analysis.

. Our holdings in Aiken and Nevius are consistent with case law in the Fourth, Fifth, Sixth, and Tenth Circuits. See, e.g., Smith v. Quarterman, 515 F.3d 392, 402 (5th Cir. 2008) (dismissing habeas petition for failure to exhaust because new evidence "regarding [petitioner's childhood and the effects of his substance abuse ... constitute 'material additional evidentiary support [presented] to the federal court that was not presented to the state court’ ” (citation omitted)); Demarest v. Price, 130 F.3d 922, 938-39 (10th Cir.1997) (finding failure to exhaust because "new evidence submitted to the district court by [the petitioner] transformed his ineffective assistance of counsel claim into one that was 'significantly different and more substantial’ ” (citation omitted)); Wise v. Warden, Md. Penitentiary, 839 F.2d 1030, 1033 (4th Cir.1988) ("The exhaustion doctrine is not satisfied where a federal habeas petitioner presents evidence which was not presented to the state court and which places his case 'in a significantly different and stronger evidentiary posture than it was when the state courts considered it.’ ” (citation omitted)); Sampson v. Love, 782 F.2d 53, 57-58 (6th Cir.1986) (dismissing habeas petition for failure to exhaust when stronger evidence presented in the federal hearing showed that jurors actually knew about petitioner’s previous sentence); Brown v. Estelle, 701 F.2d 494, 495 (5th Cir. 1983) ("Where a federal habeas petitioner presents ... evidence not before the state courts such as to place the case in a significantly different and stronger evidentiary posture than it was when the state courts considered it, the state courts must be given an opportunity to consider the evidence.’’).

. Martinez defines an initial-review collateral proceedings as "collateral proceedings which provide the first occasion to raise a claim of ineffective assistance at trial.” Martinez, 132 S.Ct. at 1315.