CALLAHAN, Circuit Judge,
joined by KOZINSKI, Chief Judge, and BYBEE, Circuit Judge, concurring and dissenting:
I concur in parts I and II of the majority opinion’s discussion. However, I respectfully dissent from part III of its discussion. The majority fails to recognize that there are three strikes against Dickens and he should be out of court. Strike one: Dickens is not eligible for the narrow exception to the exhaustion requirement that the Supreme Court recognized in Martinez v. Ryan,—U.S.-, 132 S.Ct. 1309, 182 L.Ed.2d 272 (2012), because he raised his claim of ineffective assistance of counsel (“IAC”) in state court and the claim was rejected on its merits. Strike two: Dickens’s allegations that he suffers from organic brain damage and Fetal Alcohol Syndrome (“FAS”) do not amount to a new claim and do not fundamentally alter the IAC claim that he advanced in state court and which the state court reasonably rejected. Strike three: were we to review the performance of sentencing counsel on its merits, we would have to conclude that counsel adequately presented mitigating evidence and that even if there were some failings, they were not prejudicial. We should affirm the district court’s denial of Dickens’s habeas petition.
I
The majority opinion fails to appreciate that the differences in procedural posture between this case and Martinez renders the Martinez exception inapplicable.
*1325 a. The judicial proceedings in Martinez.
While his direct appeal was still pending, Martinez began a state collateral proceeding. Martinez, 132 S.Ct. at 1314. “Despite initiating this proceeding, [his appointed habeas] counsel made no claim trial counsel was ineffective and later filed a statement asserting she could find no colorable claims at all.” Id. The state trial court gave Martinez notice that he could file a pro se petition in support of postcon-viction relief. Id. Martinez did not respond, and the state trial court “dismissed the action for postconviction relief, in effect affirming counsel’s determination that Martinez had no meritorious claims.” Id. The Arizona Court of Appeals affirmed Martinez’s conviction, and the Arizona Supreme Court denied review. Id.
“About a year and a half later, Martinez, now represented by new counsel, filed a second notice of postconviction relief in the Arizona trial court.” Id. The Supreme Court explained:
Martinez claimed his trial counsel had been ineffective for failing to challenge the prosecution’s evidence. He argued, for example, that his trial counsel should have objected to the expert testimony explaining the victim’s recantations or should have called an expert witness in rebuttal. Martinez also faulted trial counsel for not pursuing an exculpatory explanation for the DNA on the nightgown. Martinez’s petition was dismissed, in part in reliance on an Arizona Rule barring relief on a claim that could have been raised in a previous collateral proceeding. Martinez, the theory went, should have asserted the claims of ineffective assistance of trial counsel in his first notice for postconviction relief. The Arizona Court of Appeals agreed. It denied Martinez relief because he failed to raise his claims in the first collateral proceeding. The Arizona Supreme Court declined to review Martinez’s appeal.
132 S.Ct. at 1314 (citations omitted).
Martinez then filed a habeas petition in the District Court for the District of Arizona. That court “denied the petition, ruling that Arizona’s preclusion rule was an adequate and independent state-law ground to bar federal review.” Id. at 1315. We affirmed, relying “on general statements in Coleman that, absent a right to counsel in a collateral proceeding, an attorney’s errors in the proceeding do not establish cause for a procedural default.” Id. The Supreme Court granted certiorari and issued its opinion in Martinez.
b. The judicial proceedings in Dickens’s case.
The procedural posture for Dickens is different. On direct appeal, the Arizona Supreme Court affirmed his conviction and sentence. State v. Dickens, 187 Ariz. 1, 926 P.2d 468 (1996). In August 1999, Dickens filed an action for postconviction relief (“PCR”) in the state trial court. In October 2000, the trial court issued a 33-page order denying relief. Most of the order addressed the nine allegations of IAC by trial and appellate counsel, which included a claim that Dickens “was denied the effective assistance of counsel in the penalty stage.” Dickens presented a mitigation specialist who testified that, in her opinion, defense counsel’s preparation for the mitigation and sentencing phase was inadequate and unreliable. The trial court disagreed, writing:
The record reflects that defense counsel effectively elicited the testimony of mental health experts, family members and support witnesses who were well qualified and credible. Defense counsel presented numerous mitigating factors at the sentencing hearing. The perform- *1326 anee of defense counsel is not to be judged by the outcome. Of course a person, exercising hindsight, can urge that more should have been done, however, under the circumstances at the time, defense counsel’s assistance to Petitioner both in trial and during the penalty phase was professional, reasonable and effective. Most certainly, it did not fall to the level of ineffective assistance of counsel as set forth in Strickland. Further, Petitioner has failed to demonstrate that he was prejudiced by any performance of defense counsel. Concluding on this claim, it is noted that it was the defendantyPetitioner’s conduct, state of mind and participation in these crimes that led to the jury verdicts and the sentence imposed. It was not any inadequacy upon the part of either trial counsel or appellate counsel.
Dickens filed a petition for review with the Arizona Supreme Court, which the court summarily denied.
Dickens then filed a habeas petition in the District Court for Arizona. On July 14, 2008, the district court denied the petition in a 145-page decision. Among the claims the court considered and denied was Dickens’s claim of IAC by trial counsel (Claim 19). The district court carefully considered the performances of both trial counsel and PCR counsel and concluded that trial counsel’s performance at sentencing was neither deficient nor prejudicial.
c. Analysis.
A comparison of the cases’ procedural postures reveals why the Martinez exception is not available to Dickens. In Martinez, (1) Martinez’s claim of trial counsel IAC was not raised in his first state PCR petition; (2) it was raised in a second state PCR petition which the state court held to be procedurally barred; and (3) the second state PCR petition presented evidence of IAC by trial counsel. In contrast: (a) Dickens’s claim of trial counsel IAC was raised and denied on its merits by the state court in his first PCR petition; (b) Dickens never raised the claim of PCR counsel’s alleged IAC in a state court; and (c) Dickens’s assertion that trial counsel should have investigated whether he suffered from FAS and organic brain damage was raised for the first time in his federal habeas petition and has never been presented to a state court.
These differences disqualify Dickens from the Martinez exception on two grounds. First, unlike Martinez, whose trial counsel IAC claim was held to be procedurally defaulted by the state courts, Dickens did raise his claims of IAC by trial counsel in his first state PCR petition, and the claim was rejected on its merits. Second, unlike Martinez, Dickens has not sought to raise his “new” claim of trial counsel IAC in any second or successive state PCR petition.[1] Because Dickens’s claim was not deemed procedurally barred by the Arizona state courts, he does not need, and cannot qualify for, the Martinez exception to the general rule that on a habeas petition a federal court will not consider an issue that was not raised in state court.
The requirement that a state prisoner first raise his claims in state court was emphasized by the Supreme Court in Cullen v. Pinholster,—U.S.-, 131 S.Ct. *1327 1888, 179 L.Ed.2d 557 (2011). The Court held that “review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits,” and stressed that this ruling was “compelled by the broader context of the statute as a whole, which demonstrates Congress’ intent to channel prisoners’ claims first to the state courts.” 131 S.Ct. at 1398-99 (internal quotation marks omitted). The Court specifically noted that “[i]t would be contrary to that purpose to allow a petitioner to overcome an adverse state-court decision with new evidence introduced in a federal habeas court and reviewed by that court in the first instance effectively de novo.” Id. at 1399.
The remand in Martinez did not violate the law or spirit of Pinholster because Martinez had presented his claim of trial counsel ineffectiveness to a state court in his second PCR petition (that the state court had held was procedurally defaulted). See Martinez, 132 S.Ct. at 1314. Moreover, his initial PCR counsel’s ineffectiveness was apparent from the state court record, as she had filed a statement asserting that she could find no colorable claim to raise in the PCR petition that she had filed for Martinez. Id. Thus, when Martinez was remanded, the district court could determine on the record presented to the state courts whether Martinez’s first PCR counsel had been ineffective, and whether his claim of trial IAC was substantial. Id. at 1321. In contrast, although Dickens raised his mental health as a mitigating factor, there is nothing in the state court record supporting Dickens’s “new claims” of organic brain damage and FAS.
Thus, under Pinholster, the federal courts may not consider Dickens’s unex-hausted IAC claim.[2] This does not necessarily mean that Dickens is without a course of action. Dickens may still file a successive PCR petition in the state court alleging IAC by trial counsel and initial PCR counsel. If the state courts were to deny Dickens relief on the ground that the claim was procedurally defaulted, then he could file a federal habeas petition and argue for the application of the Martinez exception.[3] This process ensures that state courts get the first crack at new claims while preserving the defendant’s ability to file a federal habeas petition if relief is denied.
This procedure was followed in Trevino v. Thaler,—U.S.-, 133 S.Ct. 1911, 185 L.Ed.2d 1044 (2013), in which the Supreme Court expanded Martinez to apply to states which permit defendants to raise IAC in direct appeals but prefer that they do so in PCR petitions. Id. at 1915. In Trevino, the federal habeas petition “claimed for the first time that Trevino had not received constitutionally effective counsel during the penalty phase of his trial.” Id. The district court then “stayed proceedings to permit Trevino to raise this claim in state court.” Id. at 1916. Trevi *1328 no did so, but the Texas court concluded that because he “had not raised this claim during his initial postconviction proceedings, he had procedurally defaulted the claim.” Id. Trevino returned to the federal court which denied relief leading ultimately to the Supreme Court’s opinion. Thus, in both Martinez and Trevino, state courts determined, prior to the federal courts’ rulings on the federal petitions, that the defendants’ IAC claims were procedurally barred.
In contrast, the majority opinion, by allowing a state defendant to raise a “new” IAC claim for the first time in his federal petition, not only assumes that the state court would find the claim to be procedurally barred,[4] but also creates an incentive for the defendant not to raise an IAC claim in his state PCR petition if he thinks the federal courts will be more receptive to his claim. Why wouldn’t a defendant hold back or forego developing one claim in his first postconviction petition in the hope that he may earn another round of post-conviction proceedings by raising it for the first time in his federal habeas petition? The majority’s approach encourages state defendants to concoct “new” IAC claims that are nothing more than fleshed-out versions of their old claims supplemented with “new” evidence. This cannot have been the Supreme Court’s intention, nor is it an unintended but inherent consequence of the Supreme Court’s opinions in Martinez and Pinholster. To the contrary, Pinholster requires that a defendant first raise his claim of trial counsel IAC in state court, and Martinez provides that when defendant does this, the state court’s determination that the successive PCR petition is procedurally barred will not prevent federal court review when the failure to raise trial counsel IAC in the initial PCR petition was due to PCR counsel’s IAC. Thus, Martinez is, and should be construed as, only “a narrow exception” to the preclusion rule.[5] See Martinez, 132 S.Ct. *1329 at 1315. Dickens raised his claim of trial counsel IAC in state court and it was rejected on the merits. He does not qualify for the Martinez exception.
II
Even if the Martinez exception were applicable to Dickens’s case, I would affirm the district court’s denial of the writ because the record shows that Dickens has not raised a new claim.
We all agree that Dickens did not present his allegations of organic brain damage and FAS to the state courts. The majority, however, then leaps to the conclusion that Dickens therefore has “defaulted on his IAC claim.” This conclusion overlooks the facts that Dickens did raise claims of IAC at the sentencing stage based on his alleged mental health issues, and that the state court rejected those claims on the merits. Moreover, under our case law, Dickens’s new allegations do not constitute a new claim. Thus, because Dickens’s claim of trial counsel IAC was raised and rejected on the merits in his state PCR petition, the Martinez exception is not available to Dickens.
In his PCR petition in the state superior court, Dickens alleged that he had received IAC at the sentencing stage. PCR counsel called as a witness a mitigation specialist who testified that defense counsel’s preparation for the mitigation and sentencing phase was inadequate and unreliable. The district court in its decision noted that Dr. Roy, the clinical psychologist who assisted Dickens’s counsel, testified that defense counsel gave him everything he needed to start an investigation and did not place any limits on his work. The district court further noted that trial counsel had been aware of the significance of the sentencing stage of trial, had secured the cooperation of Dickens and his family, had access to school and medical records, and had considered numerous possibilities of neurological impairment, but that trial counsel had concluded that “neurological testing did not establish an organic basis.” The district court further rejected arguments that defense counsel’s performance was below prevailing professional norms, noting that counsel had properly informed Dr. Roy and reasonably relied on his advice.[6]
Dickens’s present claim of trial counsel IAC simply adds additional factual allegations to his initial claim of trial counsel IAC. In state court, Dickens argued that counsel’s preparation was inadequate. He continues to so argue, but now offers the additional allegation that, had counsel conducted an adequate investigation, he would have learned that Dickens suffered from organic brain damage and FAS.
But additional factual allegations do not state a new claim. In Weaver, we “acknowledge[d] that the precise factual predicate for Weaver’s claim changed after the district court conducted its evidentiary *1330 hearing,” but concluded that “new factual allegations do not render a claim unex-hausted unless they ‘fundamentally alter the legal claim already considered by the state courts.’ ” Weaver v. Thompson, 197 F.3d 359, 364 (9th Cir.1999) (quoting Chacon v. Wood, 36 F.3d 1459, 1468 (9th Cir.1994)). Similarly, here, although “the precise factual predicate” of Dickens’s IAC claim changed to specifically allege that he suffers from organic brain damage and FAS, his legal claim of IAC remains the same: counsel was ineffective because he failed to adequately investigate Dickens’s mental health. There would be no end to litigation if every new allegation as to what counsel would have found had he properly investigated a defendant’s background constituted a “new” claim.[7]
. Moreover, the record shows that Dr. Roy did consider brain damage, and his report noted that Dickens’s mother consumed wine at least three times per week while she was pregnant with Dickens. The record reflects that Dickens has not raised a new claim.
Because Dickens has not raised a new claim, we must view his IAC claim through the AEDPA lens.[8] This means that for relief on his federal habeas petition, Dickens must show that the state court’s denial of claim of IAC was an unreasonable application of clearly established Federal law, or an unreasonable determination of the facts. 28 U.S.C. § 2254(d); see Harrington v. Richter,—U.S.-, 131 S.Ct. 770, 785, 178 L.Ed.2d 624 (2011). As further demonstrated in the following section, the state court’s denial of Dickens’s claim of trial counsel IAC is neither an unreasonable application of Federal law nor an unreasonable determination of the facts.
The majority, however, relies on two pre-AEDPA cases, Aiken v. Spalding, 841 F.2d 881 (9th Cir.1988), and Nevius v. Summer, 852 F.2d 463 (1988), to argue that Dickens has fundamentally altered his legal claim of IAC. This argument is not persuasive. In Aiken, the petitioner sought to present for the first time in his federal habeas petition “decibel-level” evidence to support his claim that he had requested counsel during his interrogation. Id. at 883. We held that this was the “very type of evidence which the state *1331 should consider in the first instance,” and accordingly directed the district court to dismiss the habeas petition without prejudice for failure to exhaust state remedies. Id. at 888-84. Like the decibel-level evidence in Aiken, the evidence that Dickens suffers from organic brain damage and FAS is “the very type of evidence which the state should consider in the first instance.’ ” Id. at 883.
In Nevius, the defendant sought to challenge the prosecutor’s seven peremptory challenges, excluding minorities from the jury. 852 F.2d at 466. At oral argument in the district court on his habeas petition, Nevius’s counsel made serious allegations concerning alleged comments by the prosecutor to the defense counsel that were made after the trial. Id. at 469-70. We recognized that these representations, “if proven, might have presented in a different light the factual issues concerning the motivation of the prosecutor in exercising his peremptory challenges.” Id. at 470. Nonetheless, we declined to consider the remarks, noting:
The alleged remarks, however, are not part of any record in this case. They have not been presented to the state courts, either on appeal or during post-conviction proceedings. In habeas proceedings, the federal courts are not free to entertain new evidence that places the claim in a significantly different posture, when that evidence was never presented to the state courts.
Id. We concluded that “[if] there is evidence that should be presented to the state courts, then the attempt must first be made to present it there and to make a record. Only thereafter, under the appropriate procedural strictures may the matter be addressed in federal court.” Id. (footnote omitted).
The majority asserts that because we held in Aiken and Nevius that the new evidence should have been presented to the state courts, the new evidence must have stated a new or altered claim. But this is mixing apples and oranges. A state prisoner seeking federal habeas relief must present all new evidence to the state courts, regardless of whether the new evidence supports his existing claim, places the claim in a different light, or creates a new claim. See Aiken, 841 F.2d at 883. Whether or not Nevius’s allegations created a new claim, he had to present the facts to the state courts. Similarly, even if Aiken’s decibel-level evidence only improved “the evidentiary basis for Aiken’s right-to-counsel and voluntariness arguments,” Aiken, 841 F.2d at 883, and did not state a new claim or fundamentally alter the nature of his claims, the evidence had to be submitted to the state courts in the first instance. Thus, neither Aiken nor Nevius provides much guidance on what constitutes a “new” claim.[9] Instead, we should apply our more recent standard set forth in Weaver: “new factual allegations do not render a claim unexhausted unless they ‘fundamentally alter the legal claim already considered by the state courts.’ ” 197 F.3d at 364 (quoting Chacon, 36 F.3d at 1468).
Furthermore, the majority seeks to use Aiken and Nevius for the exact opposite purpose for which they were decided. Aiken and Nevius, although pre-AEDPA cases, sought to reinforce the standard that newly discovered evidence had to be presented in the first instance in the state courts.[10] Aiken, 841 F.2d at 883. Here, *1332 the majority seeks to characterize Dickens’s new allegations as fundamentally altering his previously exhausted IAC claim precisely to excuse his failure to present those allegations to the state courts and to allow him to present them for the first time in the federal district court.
This is contrary to the spirit of Aiken and Nevius, and most importantly, contrary to AEDPA. Title 28 U.S.C. § 2254(e)(2) limits when a federal court may hold an evidentiary hearing on a state prisoner’s federal habeas petition.[11] The majority’s holding circumvents AEDPA by providing a state prisoner an evidentiary hearing without inquiring into whether the new claim could or should have been previously raised. See § 2254(e)(2)(A)(ii). Instead, the prisoner need only convince a federal court that his claim of IAC on the part of his PCR counsel is new. He, apparently, is then entitled to an evidentiary hearing, at least to determine whether his PCR counsel was actually ineffective and whether his claim of trial counsel IAC is substantial. Majority at p. 1319. This creates another unnecessary, expensive, and improper layer to federal court review of state sentences.
Although I agree with the majority that the “Arizona courts did not have a fair opportunity to evaluate Dickens’s altered IAC claim,” Majority at p. 1319, it does not follow that Dickens’s new allegations constitute a new claim subject to the application of the Martinez exception. Rather, because Dickens’s new factual allegations do not fundamentally alter his legal claim of sentencing counsel IAC, which was rejected by the Arizona courts on its merits, federal court review is subject to and limited by AEDPA. In sum, Dickens has not raised a new legal claim.
Ill
Finally, even if I thought that the Martinez exception applied to this case and that Dickens had raised a new claim, I would still affirm the district court’s denial of the writ because the record compels a determination that Dickens cannot show “cause” and “prejudice” required for relief for IAC under Strickland, 466 U.S. at 687-96, 104 S.Ct. 2052.
In Martinez, the Supreme Court held that a prisoner may establish default on an IAC claim “where appointed counsel in the initial-review collateral proceeding, where the claim should have been raised, was ineffective under the standards of Strickland.” 132 S.Ct. at 1318. In addition, the prisoner “must also demonstrate that the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit.” Id.
*1333 The record compels the conclusion that Dickens was not denied effective assistance of sentencing counsel in regard to his “new” claims of organic brain damage and FAS.[12] The district court carefully reviewed the record of Dickens’s sentencing and concluded that counsel was competent. I agree. Moreover, there is nothing in the record to suggest that sentencing counsel knew or should have known that Dickens possibly suffered from organic brain damage and FAS. Thus, even if Dickens’s allegations are taken at face value, the record will not support a finding of “some merit” in his claims.
The district court’s determinations are not binding but are illustrative. It noted:
The [trial] court held a five-day sentencing hearing during which defense counsel called seven witnesses on Petitioner’s behalf. After the hearing counsel submitted a 76-page sentencing memorandum. Counsel listed numerous nonstatutory mitigating circumstances, including Petitioner’s diagnosis of borderline personality disorder with narcissistic features; a “troubled childhood” that featured “substantial sexual abuse and molestation, which gravely affected [his] development”; and his failure to receive necessary mental health treatment.
In order to counter the aggravating factors advanced by the State, trial counsel “emphasize[d] Petitioner’s allegedly nonviolent nature and passive role in the murders.” Counsel enlisted the assistance of Dr. Roy, a clinical psychologist who evaluated Dickens and prepared a 59-page report. Dr. Roy’s report “contained 27 pages of background information, detailing Petitioner’s childhood, education, medical and psychological history, employment background and legal history.” Dr. Roy interviewed Dickens’s parents and his mentor. Dr. Roy’s report included information on Dickens’s “reports of sexual abuse, head injuries, and the fact that Petitioner’s mother drank alcohol while she was pregnant with Petitioner.”
Dr. Roy’s report recommended neurological examinations, including EEG and MRI exams. However, at an October 1993 hearing, counsel, after consulting with Dr. Roy, informed the court that in light of a CT scan, he no longer had reason to be concerned with Dickens’s cerebral function.
Dr. Roy spent over 15 hours interviewing and testing Dickens. He then testified extensively at the sentencing hearing. The district court explained:
[Dr. Roy] diagnosed Petitioner with major depression, severe; mixed personality, with borderline narcissistic features; and suspected mild traumatic brain injury. Dr. Roy described the antecedent of Petitioner’s depression as his “near an *1334 nihilation on a regular basis during his childhood.” Dr. Roy testified that Petitioner was physically and sexually abused by his brother, abuse which was corroborated by Petitioner and his mother. This experience affected Petitioner’s ego development and prevented normal psychosocial development. Petitioner’s “primary experience of the world was being victimized,” and the resulting stress caused Petitioner to regress to a fixated state. Dr. Roy further testified that Petitioner was sexually abused by a “trusted family friend” at age six or seven; by “another adult in a position of authority,” a teacher at age 12, 13, or 14; and by a law enforcement official. These experiences “impinge[d] his identity.” However, according to Dr. Roy, despite these experiences Petitioner did not develop aggression. Rather, he dealt with his inner conflicts — “attempted to undo the trauma to him” — by helping youthful offenders. Unfortunately, Petitioner lacked “emotional ability” and experienced a “loss of ego boundary” which caused him to engage in sexual activities with underage males. Nonetheless, Dr. Roy determined that Petitioner did not meet the criteria for having violent propensities and his sexual activities with juveniles did not constitute violence. According to Dr. Roy, Petitioner was able to develop “observational capacity and show empathy for children who had been abused. However, in attempting to “eliminate his conflicts” and “find appropriate discharge,” Petitioner acted out his abuse, repeating the cycle and identifying with both victim and the aggressor. Dr. Roy testified that Petitioner’s emotional age when having sex with juvenile males was 14-16.
Dr. Roy testified in support of various mitigating factors. He asserted that Dickens: (a) had the potential for rehabilitation; (b) possessed a “borderline character structure” but not an antisocial personality disorder; (c) had no history of violence; (d) was not a danger to others (except possibly teenage boys); (e) had close family ties; and (f) was considered “a valued and diligent employee and a high achiever.” Dr. Roy “also testified that Petitioner’s traumatic childhood was a mitigating circumstance, as was his failure to receive needed psychological care.”
Dr. Roy noted that Dickens’s slow processing time on some tests, history of head trauma, emotional confusion, concentration problems, and headaches raised the possibility that Dickens suffered from brain damage. Dr. Roy, however, noted “that a CT Scan and EEG were administered and the results were ‘clear’ ” and that some of the tests he had administered “did not support a finding of organicity.”[13] Nonetheless, Dr. Roy did not think Dickens was malingering. Moreover, Dr. Roy testified that Dickens had lacked the intent to kill the Bernsteins.[14]
Sentencing counsel also called Dickens’s older brother who testified that Dickens was frequently beaten by his older brothers and was very remorseful for the victims of the shooting. Counsel also called Michael O’Connor, a sheriffs sergeant from San Diego, who testified that when *1335 Dickens was referred to the Juvenile Intervention Diversion Program following a drug offense, he had worked well with the kids for five years. In addition, counsel called a psychologist who had examined Amaral and Dickens’s mother. Counsel also called a family friend, who testified that Dickens “loved his mother, enjoyed helping out adults and was always busy with chores.”
In support of its conclusion that “counsel’s performance at sentencing was neither deficient nor prejudicial,” the district court found that sentencing counsel had been aware of the significance of the sentencing stage of the trial. The court found no factual basis for the allegation that counsel had failed to provide Dr. Roy with sufficient information or guidance. It also found no basis for questioning counsel’s decision to retain and rely on Dr. Roy, “an experienced clinical psychologist who had testified regarding mitigation on previous occasions.” The court observed that even if “Dr. Roy was not prepared to testify, or if his testimony was not persuasive, it was not the fault of defense counsel.”
Having determined that sentencing counsel had performed adequately, the district court buttressed its denial of relief by also finding that Dickens could not meet the second prong of Strickland — that is, he could not show prejudice. The district court’s conclusion was based on the scope and depth of the mitigating case presented, as well as distinguishing trial counsel’s performance from the performances addressed in recent decisions of the Supreme Court.[15] The court determined that unlike the situations presented in those cases, Dickens’s “claim of prejudice arising from counsel’s investigation into mitigating circumstances and handling of Dr. Roy is not supported by the record.” The district court opined: “[wjhether or not counsel should have provided Dr. Roy with additional information or direction, given the evidence that was presented in mitigation there was not a reasonable probability of a different sentence if counsel had taken a different approach to his mitigation case or more thoroughly prepared Dr. Roy as a witness.” The court also commented that Dickens “failed to identify a significant disparity between the evidence that could have been presented at sentencing and the evidence that counsel did present.”
Finally, the district court observed that Dickens was not prejudiced by counsel’s performance at sentencing because “the same judge presided over both Petitioner’s trial and sentencing and the litigation of his ineffective assistance claims during the PCR proceedings.” The district court suggested that the standard should be whether there is a reasonable possibility that further mitigating evidence would *1336 have changed the trial judge’s position.[16] The district court concluded the state trial judge “assessed Petitioner’s ineffective assistance claim after presiding over trial and sentencing, applied Strickland to reject Petitioner’s allegation of prejudice, and noted that imposition of the death sentence was not a close call.”
As noted, the district court’s conclusions are not binding on us, but its description of the sentencing hearing and defense counsel’s efforts are accurate. Dickens’s proffer of contrary evidence does not rise to the low threshold of “some merit.” Martinez, 132 S.Ct. at 1318. Dickens asserts that his sentencing counsel had little experience with capital cases, did not conduct “assessment interviews” of family and Mends to discover background information, and was not aware of mitigation specialists. Dickens objects that rather than conduct a complete mitigation investigation, sentencing counsel handed documents over to Dr. Roy “and left the entire presentation of the mitigation case in Dr. Roy’s hands. Dickens further alleges that a box of general information was missing from the boxes of information given to Dr. Roy and that Dr. Roy had no experience presenting mitigating evidence in capital trials.
Addressing his claimed FAS and brain damage, Dickens now argues that even though Dr. Roy’s report noted that Dickens’s mother drank alcohol three times a week while she was pregnant with Dickens, counsel “failed to retain an expert to discuss the effects that alcohol had on his client in útero.” He also argues that Dr. Roy’s report indicated the possibility of organic brain damage that led to the further testing by a Dr. Weiss, but that Dr. Weiss was more concerned with a back injury Dickens sustained after the crime occurred, and his report failed to consider Dr. Roy’s concern with limited brain functioning. Dickens claims that sentencing counsel “failed to equip Dr. Weiss with the tools necessary to properly make a determination regarding testing.”
These observations do not provide a sound basis for an IAC claim. Dickens was tried and sentenced twenty years ago in 1993. Counsel’s performance must be evaluated on the basis of the standard of representation as it then existed.[17] See Strickland, 466 U.S. at 689, 104 S.Ct. 2052. Moreover, as we recently reiterated in Cox v. Ayers, 613 F.3d 883 (9th Cir.2010), “[t]he burden is on Petitioner to ‘identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment.’ ” Id. at 893 (quoting Strickland, 466 U.S. at 690, 104 S.Ct. 2052). Here, taking Dickens’s allegations at face value, his “new” claim of *1337 IAC lacks merit. He argues that counsel did not retain an expert to discuss the effects that alcohol had on his client in útero, but there is little to suggest that counsel should have been aware of this possibility. At most, it is possible that Dr. Roy might have been able to learn of this possibility, but there is nothing to suggest that he actually knew of the possibility or deliberately failed to inform counsel.[18] Similarly, counsel reasonably relied on his experts to assess the possibility of Dickens’s brain damage. Again, it is possible, as Dickens now argues, that his experts failed to properly test and diagnose his brain damage, but sentencing counsel can hardly be faulted for not perceiving this.[19]
Furthermore, the alleged failure to detect two possible mental concerns must be considered in the context of all the psychological and mental mitigating factors that sentencing counsel and Dr. Roy did develop. As noted, Dr. Roy diagnosed Dickens “with major depression, severe; mixed personality, with borderline narcissistic features; and suspected mild traumatic brain injury.” Dr. Roy testified to Dickens’s beating by his brothers, his sexual abuse as a child, his history of head traumas, and even that his mother drank when she was pregnant with Dickens. Considering the totality of the evidence, the only reasonable conclusion is that sentencing counsel performed adequately, at least insofar as he failed to discover Dickens’s alleged organic brain damage and FAS.
The totality of the evidence also compels the conclusion that even if sentencing counsel’s performance somehow fell below the mark, Dickens was not prejudiced. In sentencing Dickens, the trial judge found at least two aggravating factors. The court found no statutory mitigating factors, and Dickens does not argue that his present claim of brain damage and FAS would constitute a statutory mitigating factor. The trial court noted that Dickens had urged a list of 31 non-statutory mitigating circumstances. It agreed with a number of these. It found that Dickens “had a troubled childhood, that his family was somewhat dysfunctional, that he has always had a loving and caring mother and he now has a supportive family.” The court further found that Dickens exhibited “some sympathy or remorse,” but that his “capacity to appreciate the wrongfulness of his conduct at the time of planning and execution of these offenses or to conform his conduct at that time to the requirements of law was not significantly impaired.” It is extremely unlikely *1338 that presenting further evidence concerning Dickens’s brain damage or FAS would have resulted in a different sentence.[20]
In sum, in contrast to the factual records in cases where we have found IAC based on trial counsel’s failure to adequately investigate or present a defendant’s mental condition,[21] a review of Dickens’s sentencing hearing (as well as his state postconviction proceedings) shows that trial counsel reasonably presented mitigating evidence concerning Dickens’s mental condition. Furthermore, it is unlikely that the state judge, who sentenced Dickens and presided over his postconviction proceeding, would have been swayed by the “new” evidence (developed well after his sentencing) that Dickens might have suffered from organic brain damage and FAS. Accordingly, even if I could conclude that Dickens was procedurally eligible for the Martinez exception, and even if I could conclude that he is asserting a “new” claim that justifies him raising assertions for the first time in a federal habeas petition, I would still affirm the denial of Dickens’s habeas petition because this record compels a determination that his sentencing counsel’s performance was not inadequate.
For the reasons set forth in parts I and II of the majority opinion’s discussion, Dickens’s Enmund/Tison claim is properly rejected. However, Dickens’s request for relief pursuant to the Supreme Court’s opinion in Martinez should also be rejected because he is not eligible for relief under Martinez, he has not proffered a “new” claim, and there is no merit to his proffered claim. The district court’s denial of his federal habeas petition should be affirmed. Accordingly, I respectfully dissent from majority’s remand of this case to the district court.

. The majority asserts that "the first time [Martinez] argued ineffective assistance of PCR counsel was in his federal habeas petition.” Maj. at 1322 n. 17. However, at a minimum, the alleged IAC of PCR counsel was implicit in Martinez’s second state habe-as petition. Certainly the factual basis for seeking an exception to the procedural bar was presented to the state court. See Martinez, 132 S.Ct. at 1314.

. To the extent that Dickens contends that his trial counsel IAC claim was exhausted (as he initially did), the district court had jurisdiction to consider it. However, the district court’s careful consideration of the IAC claim persuasively shows that Dickens cannot prevail under the AEDPA standard. As set forth in section III, infra, I agree that Dickens has not shown that trial counsel’s performance met either the performance or the prejudicial prong of the standard for IAC set forth in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

. Of course, Dickens might be required to explain why he did not file his successive petition earlier. One response might be that until the Supreme Court decided Martinez, he was barred by Coleman v. Thompson, 501 U.S. 722, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991), from obtaining relief based on PCR counsel’s ineffectiveness.

. The parties have informed us through letters submitted pursuant to Federal Rule of Appellate Procedure 28(j) that there are now decisions by superior courts in Arizona and by the Court of Appeals of Arizona, Division 2, holding that Martinez does not change Arizona law. While these may reflect Arizona law as it is, they are not binding on the Arizona Supreme Court and, of course, the state courts have not had an opportunity to fully consider the Supreme Court's recent opinion in Trevino. Furthermore, a review of the cases cited by the parties suggests that courts may have determined that there was no merit to the particular petitioners’ Martinez claims, rather than ruling that an otherwise meritorious claim of trial counsel IAC would not be considered. Of course, the Arizona courts may determine whether as a matter of state law they will modify their preclusion rule in light of Martinez and Trevino. However, we should not presume that they will forego considering an otherwise meritorious claim of trial counsel IAC that postconviction counsel failed to raise in favor of having the claim considered by a federal court in the first instance.

. I have no quarrel with the statement in the plurality opinion in Detrich that the Martinez exception may apply where PCR counsel raised some issues of trial counsel IAC, but not the new substantial claim of trial counsel IAC that he seeks to raise for the first time in his federal habeas petition. See Detrich v. Ryan, 740 F.3d 1237, 1247-50, 2013 WL 4712729, *8-10 (9th Cir.2013) (en banc). Here, as set forth infra, Dickens has not raised a new substantial claim of trial counsel IAC separate from the claims rejected on their merits by the state courts. However, where such an assertion is made, because there has been no state court determination that the new claim is procedurally barred, the district court should adhere to the procedure followed in Trevino, and stay proceedings to permit the petitioner to attempt to raise the new claim in state court. See Trevino, 133 S.Ct. at 1916.
In our case, Arizona has represented that it would be futile for Dickens to present his current IAC claim to the Arizona courts. Thus, Arizona may well have waived any argument that Dickens's current IAC claim is not procedurally barred. See Trest v. Cain, 522 U.S. 87, 89, 118 S.Ct. 478, 139 L.Ed.2d *1329 444 (1997); Lynce v. Mathis, 519 U.S. 433, 436-37 n. 4, 117 S.Ct. 891, 137 L.Ed.2d 63 (1997); Gray v. Netherland, 518 U.S. 152, 165-66, 116 S.Ct. 2074, 135 L.Ed.2d 457 (1996). This possibility is not dispositive, however, because as explained in Sections II and III of this dissent, Dickens’s claim is neither new nor meritorious.

. The district court stated:
Petitioner’s complaint that counsel did not provide enough information or guidance to Dr. Roy is not supported by the record. It is evident that counsel, recognizing the significance of the penalty stage of trial, investigated Petitioner's background and presented the relevant information to Dr. Roy and offered it to the trial court in his sentencing memorandum and through expert and lay testimony.

. This concern is illustrated by our recent decision in Schaci v. Ryan, 732 F.3d 963 (9th Cir.2013). There we rejected petitioner’s contention that he was presenting a "new” issue of trial counsel IAC. We noted:
Schad's principal contention is that the district court erred because he is presenting a different ineffective assistance claim than that presented in state court. He is now contending that the federal claim of counsel ineffectiveness with respect to the effect of childhood abuse is somehow distinct from the earlier claim of ineffectiveness in failing to investigate the childhood abuse itself. The two cannot be so easily separated, however, because the relevant mitigating factor in sentencing was always the effect of the childhood abuse on his adult mental state.
Id. at 966. Similarly, Dickens’s "new” assertion is based on what he now contends trial counsel would have learned if he had adequately investigated his mental health, but Dickens's underlying claim, which was rejected by the state courts, was and is that trial counsel failed to adequately investigate his mental health.

. Indeed, in his opening brief, filed before the Supreme Court's opinion in Martinez, Dickens argued that he:
alleged that his trial counsel failed to conduct the necessary background mitigation investigation and therefore did not adequately prepare defense expert, Dr. Roy. This was the same claim that he raised in his federal habeas proceedings with the exception of additional factual support for the claim — namely that Dickens suffers from FAS and organic brain damage.
In his brief, Dickens argues that because he exhausted his remedies in state court, "the district court was required to consider the additional facts in support of his claim.”

. In addition, we have questioned the continuing validity of cases such as Aiken and Nevius following the issuance of the Supreme Court's opinion in Pinholster. See Stokley v. Ryan, 659 F.3d 802, 808 (9th Cir.2011).

. In Aiken, we reiterated the Fifth Circuit’s statement in Dispensa v. Lynaugh, 826 F.2d 375, 377 (5th Cir.1987), that:
[Where] a federal habeas petitioner presents newly discovered evidence or other *1332 evidence not before the state courts such as to place the case in a significantly different and stronger evidentiary posture than it was when the state courts considered it, the state courts must be given an opportunity to consider the evidence.
Aiken, 841 F.2d at 883 (alteration in original).

. 28 U.S.C. § 2254(e)(2) reads:
If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evi-dentiary hearing on the claim unless the applicant shows that—
(A) the claim relies on—
(i) a new rule of constitutional law, made retroactive to cases on. collateral review by the Supreme Court, that was previously unavailable; or
(ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
(B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

. Dickens argues that his PCR counsel were ineffective because they allegedly focused on claims of judicial bias instead of "investigating and presenting meritorious issues. Dickens complains that counsel "put on no lay or expert witness to show what evidence would have been presented had trial counsel properly investigated mitigation and adequately prepared Dr. Roy for sentencing." The district court disagreed with Dickens, noting that in the PCR proceeding, counsel argued that sentencing counsel "did not adequately prepare Dr. Roy or investigate Petitioner’s background for mitigating information, particularly with respect to mental impairment." Although the record appears to support the district court's perspective, we need not evaluate the performance of PCR counsel when sentencing counsel’s performance was adequate. See Martinez, 132 S.Ct. at 1318 ("[A] prisoner must also demonstrate that the underlying ineffective-assistance-of-trial-counsel claim is a substantial one.”). If trial counsel's performance was adequate, the petitioner cannot have been prejudiced by PCR’s counsel’s alleged failure to challenge trial counsel's performance.

. The district court further determined that sentencing counsel "did not ignore or overlook evidence of possible brain damage," because although Dr. Roy noted that Dickens showed symptoms of neurological impairment, "neurological testing did not establish an organic basis."

. Dr. Roy also testified in detail about Amaral, who was Dickens’s partner in crime and actually shot the victims. He thought that Amaral had a psychopathic personality and had controlled and manipulated Dickens.

. The district court distinguished the cases of Rompilla v. Beard, 545 U.S. 374, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005), Wiggins v. Smith, 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003), and Williams v. Taylor, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000), based on the amount of mitigating evidence that counsel failed to present at sentencing. See Rompilla, 545 U.S. at 391-93, 125 S.Ct. 2456 (counsel failed to present evidence of alcoholic and violent parents, extreme poverty, isolation, and reduced cognitive capabilities); Wiggins, 539 U.S. at 535, 123 S.Ct. 2527 (counsel failed to present evidence of abusive alcoholic mother, physical and sexual abuse in foster care, and diminished mental capabilities); Williams, 529 U.S. at 395-96, 120 S.Ct. 1495 (counsel failed to present evidence of parents’ imprisonment for criminal neglect, abusive foster home, reduced mental capabilities, and commendations given to defendant for positive behavior). In all three cases, the Supreme Court held that if the jury had access to this information during the trial, there was a reasonable probability that a different sentence might have resulted. See Rompilla, 545 U.S. at 392, 125 S.Ct. 2456; Wiggins, 539 U.S. at 536, 123 S.Ct. 2527; Williams, 529 U.S. at 398, 120 S.Ct. 1495.

. The district court cited Smith v. Stewart, 140 F.3d 1263, 1270 (9th Cir.1998) ("We are asked to imagine what the effect might have been upon a sentencing judge, who was following the law, especially one who had heard the testimony at trial. Mitigating evidence might well have one effect on the sentencing judge, without having the same effect on a different judicial officer.”)

. In Strickland, the Supreme Court stated:
Judicial scrutiny of counsel’s performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel’s assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel’s defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. Cf. Engle v. Isaac, 456 U.S. 107, 133-34, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982). A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel’s challenged conduct, and to evaluate the conduct from counsel's perspective at the time.
466 U.S. at 689, 104 S.Ct. 2052.

. In his 2002 declaration, Dr. Thomas Thompson, a psychologist retained by Dickens, alleges that "[a]lcohol exposure in útero is and was known to have a major teratogenic impact on the central nervous system (brain) of the developing fetus in 1992. He then lists a number of academic articles that discussed fetal alcohol syndrome that were available in 1992. However, when addressing the specifics of this case, Dr. Thompson writes:
The amount of alcohol Joan Dickens consumed during her pregnancy with Greg constitutes an amount sufficient to produce Fetal Alcohol Syndrome as defined by the Institute of Medicine Report of 1996. See Fetal Alcohol Syndrome: Diagnosis, Epide-mology, Prevention, and Treatment 74-79 (Kathleen Stratton, Cynthia Howe, and Frederick Battablia eds., Institute of Medicine, 1996).
This suggests that the test for FAS was not established or widely disseminated until 1996, three years after Dickens was sentenced.

. On appeal, Dickens has not offered any evidence that counters the district court's determination that he "failed to identify a significant disparity between the evidence that could have been presented at sentencing and the evidence that counsel did present." Whatever Dr. Roy’s shortcomings in failing to diagnose Dickens with organic brain damage and FAS, there is nothing in the record to suggest that trial counsel knew or should have known of these alleged failings.

. A report prepared by Dr. Thomas Thompson indicates that FAS may retard appropriate adult developmental maturity, result in poor judgment and decision making, and in Dickens "resulted in neuropsychological deficits that impaired his ability to overcome difficulties associated with a chaotic social-emotional learning environment present in the family home." This is not an assertion that Dickens was not capable of appreciating the wrongfulness of his conduct. Moreover, in the context of Dickens’s involvement with Amaral and the murder, further medical explanations for Dickens’s behavior were not likely to have changed the sentencing judge’s mind.

. See, e.g., Silva v. Woodford, 279 F.3d 825, 846 (9th Cir.2002) (counsel’s performance deficient where counsel "conducted no investigation whatsoever into Silva’s past and also failed to even minimally assist in the preparation of possible mental defenses”); Bean v. Calderon, 163 F.3d 1073, 1078 (9th. Cir.1998) (counsel "engaged in no preparation” and "conducted no investigation of penalty-phase issues”); Claboume v. Lewis, 64 F.3d 1373, 1384 (9th Cir.1995) (counsel "did not call any witnesses, introduce any evidence of [defendant's] history of mental illness, or argue any mitigating circumstance besides [defendant’s] mental condition at the time of the offense”); Wallace v. Stewart, 184 F.3d 1112, 1114 (9th Cir.1999) (counsel failed to discover and provide to their mental health experts various test results and information about defendant's incredibly dysfunctional family background).